# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and
Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

September 8, 2020

By ECF and Electronic Mail
The Honorable William F. Kuntz II
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     United States v. Steven Carter, 20 CR 295 (WFK)

Your Honor:

Steven Carter was indicted on August 6, 2020 by the one of the first sitting grand juries in the Eastern District of New York (EDNY) after the court closed in March due to Covid-19. The unusual circumstances of the indictment-the fact that the indicting grand jury was located in Central Islip, and that to date, no grand juries in Brooklyn, where this case will be prosecuted, have achieved a quorum--may have compromised Mr. Carter's right to a grand jury selected from a fair cross section of the community. Accordingly, through this letter motion and the enclosed declaration of statistician Jeffrey Martin, *see* Exhibit A, Mr. Carter respectfully requests access to the records and papers used in connection with the constitution of the Master and Qualified Jury Wheels in the United States District Court for the Eastern District of New York, pursuant to the Fifth and Sixth Amendments to the United States Constitution and the Jury Selection and Service Act ("JSSA"), 28 U.S.C. §§ 1867(a) and (f). Mr. Carter also respectfully requests that the Court schedule a phone call with the EDNY Jury Administrator and the parties in the above-captioned case so that the parties and the Court may learn what information is available for the motion to inspect.

**Mr. Carter is entitled to inspect the requested materials.**

Section 1867(f) of Title 28 of the United States Code allows a defendant to "inspect, reproduce, and copy . . . records or papers [used by the commission or clerk in connection with the jury selection process] at all reasonable times during the preparation and pendency of . . . a motion" to challenge the composition of the jury on the ground that it failed to reflect a fair cross-section of the community. 28 U.S.C. §§ 1867(a), (f); *see also Test v. United States*, 420 U.S. 28, 30 (1975). Inspection of such materials is essential to a defendant's ability to determine whether he has a potentially meritorious challenge. *Test*, 420 U.S. at 30. Therefore, "an unqualified right to inspection is required not only by the plain text of the statute, but also by the statute's overall purpose of insuring 'grand and petit juries selected at random from a fair cross section of the community.'" *Id.* (quoting 28 U.S.C. § 1861(d)).

1

In order to invoke the right to inspect under Section 1867(f) and "[t]o avail himself of [the] right of access to otherwise unpublic jury selection records, a litigant needs only allege that he is preparing a motion challenging the jury selection procedures." *United States v. Alden*, 776 F.2d 771, 773 (8th Cir. 1985) (internal citations omitted). Mr. Carter is not required to make any showing with respect to the probability of success of the motion. *See, e.g.*, *United States v. Williamson*, 903 F.3d 124, 133 (D.C. Cir. 2018); *United States v. Royal*, 100 F.3d 1019, 1025 (1st Cir. 1996); *see also United States v. Gotti*, 2004 WL 2274712 (S.D.N.Y. 2004) (granting motion for discovery even absent any showing that information would reveal a violation).

We do not seek any personal identifying information for the individuals whose records are maintained by the jury clerk's office. As such, the full set of records should be provided in the manner requested by the attached declaration. *See United States v. Saipov*, 17-cr-722 (VSB), 2020 WL 915808, at *3 (S.D.N.Y. Feb. 26, 2020) (granting similar request in full).

**Request for a Conference Call with the EDNY Jury Administrator to clarify the nature and availability of the materials requested.**

A conference call was held in the Southern District of New York (SDNY) on a set of similar motions to inspect SDNY grand jury materials that had been filed on an earlier timeline. We believe that a similar call with the EDNY Jury Administrator would greatly benefit the parties and the Court by clarifying the nature and availability of the documents and information in this district responsive to the items listed Mr. Martin's affidavit. As in the SDNY, following such a call, if the Court deems it appropriate, we would confer with the government about which specific records the defendant is requesting, and what, if any, objections the government has to those requests, following which the parties could submit a joint status letter to narrow any disputes.

The conference call held by Judge Failla in the Southern District[1] was for "factual development preliminary to legal issues." *United States v. Balde*, 20-CR-281 (KPF) (S.D.N.Y. June 30, 2020); Teleconference Transcript ("Tr.") at 6:11-12, enclosed as Exhibit B. During the call, the SDNY Jury Administrator provided extensive details concerning the actual implementation of the grand jury plan and management of the master and qualified jury wheels in the SDNY. Having reviewed the transcript of that conference, we would request that such a call provide information about, *inter alia*:

- The specific software systems used to pull names from the Qualified Jury Wheel for jury pools. *See* Tr. at 10:14-11:6.

- The software system mechanics for the generation of jury pools. *Id.* at 11:11-20.

---

[1] Judge Failla led the call with the Jury Administrator on behalf of herself and five other judges in the SDNY with similar motions pending before them, with all parties involved in all of the cases invited to participate, so that the information from the Jury Administrator could be conveyed as effectively and efficiently as possible. Upon information and belief, several cases raising this issue are pending before several judges in the EDNY. Should this Court wish to proceed as Judge Failla did or defer the matter to one of the other judges where a similar motion is pending, the defendant would have no objection.

- The involvement and role of third-party vendors or contractors in the jury qualification and selection processes. *Id.* at 11:21-12:11.

- The processing and handling of jury qualification questionnaires. *Id.* at 12:15-13:11.

- The specific process involved in the creation and maintenance of a Master Jury Wheel. *Id.* at 13:16-15:3.

- The specific procedure used to pull and qualify names from the Master Jury Wheel for inclusion on the Qualified Jury Wheel. *Id.* at 15:6-16:22.

- The existence or use of subdivided Qualified Jury Wheels within the District, or any pattern or practice relating to subdividing jurors by county of residence, whether or not written down. *Id.* at 16:15-18:12; 41:6-8.

- The production and storage of AO-12 demographic analysis reports. *Id.* at 19:5-20:5, 20:21-21:8.

- The production and storage of JS-12 demographic analysis reports. *Id.* at 20:6-20:20.

- The procedures and records involved in excusing jurors summoned for selection. *Id.* at 25:23-28:1.

- The specific involvement of the U.S. Attorney's Office in scheduling grand juries, keeping grand juror attendance, excusing grand juror attendance, enforcing grand juror attendance, and reporting grand juror attendance to the jury administrator. *Id.* at 28:16-17; 28:18-30:19.

- Any amendments made to the current Grand Jury Plan. *Id.* at 31:20-32:18.

- The specific procedures and processes for producing, maintaining, and storing the information and documents responsive to the items listed in the Martin Affidavit (which was functionally identical to the affidavit here). *Id.* at 33:16-46:2.

- Information about any other documents that might be responsive to the items in the affidavit or relevant to grand jury challenges. *Id.* at 46:3-46:8.

- Any additional clarification of the information provided by the jury clerk. *Id.* at 47:2-54:17.

**Timeliness of the request.**

Pursuant to Section 1867(a), a defendant may raise a JSSA challenge "before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier." *See* 28 U.S.C. § 1867(a). Although the Second Circuit has not considered what constitutes the timely filing of a motion pursuant to the JSSA related to the composition of a grand jury, some courts have determined that the statute requires an attempt to inspect grand jury records within seven days of the filing of an indictment. *See Saipov*, 2020 WL at *2 (citing cases from the Eleventh Circuit, the Northern District of Florida, and the Western District of New York). Accordingly, we ask the Court to grant this timely request for inspection of records and enclose a proposed order for the Court's signature. We also respectfully request an opportunity to reply to any government response or sur-response to this motion.

Finally, although we do not read Section 1867(a) as requiring that a motion to dismiss be filed within seven days of the indictment, in an abundance of caution we do hereby move to dismiss the indictment on the grounds that the grand jury procedures in this case violated Title 28 of the United States Code. We would additionally seek leave of the Court to supplement this motion to dismiss once we have had an opportunity to inspect the grand jury records that are the subject of the above request. Once the records are obtained, we will analyze them with the assistance of our expert to determine whether the grand jury plan procedures violated Mr. Williams' right to a grand jury "selected at random from a fair cross-section of the community." 28 U.S.C § 1861; *see also* 28 U.S.C. §§ 1863(b)(3), 1866(f).

Respectfully Submitted,

Michael P. Padden, Esq.
*Attorney for Steven Carter*
Federal Defenders of New York

Enc.  (A – Proposed Order; B – Declaration of Jeffrey Martin; C – Transcript)

Cc:  AUSA Frank Cavanagh  (via ECF and Email)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES<br><br>-against-<br><br>STEVEN CARTER | **ORDER**<br><br>**20 CR 295 (WFK)** |

In order to permit the defendant to meaningfully review the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel that was used to select the Grand Jurors who returned the Indictment in this case on August 6, 2020, pursuant to 28 U.S.C. §§ 1867(a) and (f), and for the reasons set forth in the declaration of Jeffrey Martin, the Clerk of the Eastern District of New York is hereby ordered to make available all data listed in Attachment 1 to Mr. Martin's declaration within 14 days of this Order.

Dated:          September __, 2020
                Brooklyn, New York

_____
**WILLIAM F. KUNTZ II,**
**U.S. DISTRICT JUDGE**

## DECLARATION OF JEFFREY MARTIN

The undersigned, Jeffrey Martin, declares as follows:

1. My name is Jeffrey O'Neal Martin. I hold a Bachelor's degree in Mathematics and Economics from Vanderbilt University and a Master's degree in Economics from the University of Chicago.
2. I am employed as a consultant on statistical issues, a consultant on actuarial issues, and as a consultant to political campaigns. I have been qualified as an expert on statistical issues in Federal Courts and State Courts.
3. Since 1997, I have been involved in cases involving challenges to the jury lists in Federal and State Courts.
4. I have been asked by the Federal Defenders of New York to review the construction and implementation of the Master Jury Wheel and Qualified Jury Wheel that was used to select Grand Jurors in this case.
5. In order to complete the review, I require data as listed in "Attachment 1" for data relating to the Grand Jury in this case.
6. I am prepared to answer any questions the Court may have and will be glad to discuss ways in which the data can be delivered that best fits the way in which the Clerk's office operates.
7. I do not seek any personal information that would allow the identification of any individual.
8. The information requested is common to other reviews of Federal jury wheels that I have been asked to perform. The information requested herein has been provided to me in connection with my work as an expert in approximately 10 similar challenges brought on behalf of federal criminal defendants in this and other federal jurisdictions.
9. In "Attachment 1" items #1 through #14 do not involve any personal or other information that could be used to identify any individual.
10. In "Attachment 1" items #15 through #19 should only include the randomly generated Juror Number and not the Name, Street Address, Day of Birth, or Month of Birth. In this way, no individual person can be identified.
11. In "Attachment 1" item #20 should have the individual's Name and Street Address redacted in order to remove any personally identifiable information.
12. In "Attachment 1" items #21 through #23 inherently include personally identifiable information. The personal information can be redacted or only supplied for inspection in the Clerk's office to safeguard personal information.
13. Item #23 is requested to determine the demographic effects of the current pandemic on the operation of the grand jury in this case. This type of information is specific to the current pandemic and has not been requested in other reviews I have been asked to perform.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Dated this 17th day of June 2020

_____Jeffrey Martin

## ATTACHMENT 1

1) The Jury Plan for the Eastern District of New York currently in effect and, if different in any respect, at the time grand jurors were summoned in this case. This Plan is believed to be the "Jury Selection Plan (As amended October 30,2006)" effective October 30th, 2006.

2) A description of any changes from the previous procedures or from the Jury Plan for the grand jury or creation of the grand jury because of the Covid-19 pandemic.

3) Any order of the Court that effects the previous procedures or the Jury Plan for the grand jury or creation of the grand jury because of the Covid-19 pandemic.

4) A description of work done, contact information, and communications with any vendors in the creation of the Master and Qualified Jury Wheels used to summon grand jurors in this case.

5) A confirmation that the grand jury in this case was selected from the entire District or, if not, a description of the basis and selection for the grand jury in this case.

6) Any AO-12 form or JS-12 form created which relates to the Master Jury Wheel and Qualified Jury Wheel that were used to summon the grand jurors who returned the indictment in this case as required by 28 U.S.C. § 1863(a).

7) Any other statistical or demographic analyses produced to ensure the quality and compliance of the Master Jury Wheel and Qualified Jury Wheel that were used to summon grand jurors in this case with the Jury Plan (especially Section 2), Jury Selection and Service Act and constitutional requirements.

8) The date when the Master Jury Wheel that was used to summon grand jurors in this case was refilled as described in the Jury Plan Section 5.

9) The calculation of the proportional representation of counties in the Master Jury Wheel described in the Jury Plan Section 4.

10) The procedures implemented related to prospective jurors who do not respond to a juror qualification form or have their juror qualification form returned from the Postal Service as undeliverable.

11) The number of persons who failed to return a completed juror qualification form as described in the Jury Plan Section 6.

12) The number of persons who failed to return a completed juror qualification form and who were summoned by the clerk to appear before the clerk to fill out a juror qualification form as described in the Jury Plan Section 6.

13) The date when grand jurors were summoned in this case.

14) The number of persons summoned from the Qualified Jury Wheel to be considered as grand jurors in this case.

15) The Master Jury Wheel data as described in the Jury Plan Section 5 in electronic and accessible form that includes Juror Number, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County and Jury Division.

16) The Qualified Jury Wheel data as described in the Jury Plan Section 11 in electronic and accessible form that includes Juror Number, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County and Jury Division.

17) Status Codes for potential jurors who were selected from the Master Jury Wheel for qualification who either had their qualification form returned by the postal service, did not respond or were disqualified or exempted from jury service as described in the Jury Plan. The data should be in electronic and accessible form that includes Juror Number, whether the form was returned Undeliverable, whether the form was not returned, Reason for Disqualification, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County, and Jury Division.

18) The Juror Number only (and not Name or Street Address) for persons who failed to return a completed juror qualification form and who were summoned by the clerk to appear before the clerk to fill out a juror qualification form as described in the Jury Plan Section 6.

19) The Juror Number only (and not Name or Street Address) for persons selected as potential grand jurors in this case.

20) The source of data in electronic form for the Master Jury Wheel used to summon grand jurors in this case as described in the Jury Plan Section 4 (voter registration list and list from the New York State Department of Motor Vehicles). The data should include, as available, Race, Gender, Hispanic Ethnicity, Year of Birth, Zip Code, City, County, and Jury Division but not any personal information or information that could be used to identify any individual such as Name or Street Address.

21) The juror qualification and summons forms for persons summoned to potentially become grand jurors in this case.

22) The disposition of each summoned potential grand juror in this case as to excusal, deferment, disqualification or selection as described in the Jury Plan.

23) The attendance record and reason for absence by date for each grand juror.

K6u5balC                          teleconference

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

          v.                                 20 Cr. 281 (KPF)

SOULEYMANE BALDE,

                    Defendant.

------------------------------x

                                             June 30, 2020
                                             2:00 p.m.

Before:

                    HON. KATHERINE POLK FAILLA,

                                             District Judge


                         APPEARANCES

AUDREY STRAUSS (Acting)
     United States Attorney for the
     Southern District of New York
BY:  KIERSTEN FLETCHER
     MARY C. SLAVIK
     Assistant United States Attorneys

FEDERAL DEFENDERS OF NEW YORK
     Attorneys for Defendant
BY:  JENNIFER WILLIS
BY:  ISAAC WHEELER

ALSO PRESENT:  LINDA THOMAS, JURY ADMINISTRATOR, S.D.N.Y.

K6u5balC                          teleconference

1    ALSO PRESENT REGARDING:

2

3    United States v. Baker, 20 Cr. 288 (LJL),

4    United States v. Henry, 20 Cr. 293 (LJL),

5    United States v. Williams, 20 Cr. 286 (WHP),

6    United States v. Shulte, 17 Cr. 548 (PAC),

7    United States v. Rodriguez, 20 Cr. 301 (PKC),

8    United States v. Leonos-Perez, 20 Cr. 300 (PAC),

9    United States v. Hightower, 20 Cr. 303 (RMB),

10   United States v. Simmons, 20 Cr. 294 (PKC).

11

12   ASSISTANT UNITED STATES ATTORNEYS

13

14       Thomas Burnett

15       Nick Chiuchiolo

16       Peter Davis

17       Sid Kamaraju

18       Lindsey Keenan

19       Tom McKay

20       Daniel Nessim

21       Josiah Pertz

22       Andrew Rohrbach

23       Thomas Wright

24

25

K6u5balC                          teleconference

1   DEFENDANTS' COUNSEL

2

3        Annalisa Mirón, Federal Defenders

4        Ariel Werner, Federal Defenders

5        Christopher Flood, Federal Defenders

6        David Patton, Federal Defenders

7        Robert Baum, Federal Defenders

8        Edward Zas, Federal Defenders

9        Jonathan Marvinny, Federal Defenders

10       Donna Newman

11       Sabrina Shroff

12       Bobbi Sternheim

13       Michael Bachrach

14

15

16

17

18

19

20

21

22

23

24

25

K6u5balC                       teleconference

1        (Case called)

2        THE DEPUTY CLERK:  Counsel, we are ready to begin.  A

3   couple of things to go over before I bring in the Judge.

4   Recording of this conference and/or the rebroadcasting of it is

5   not allowed, we do have a court reporter on the line, and that

6   I ask that you identify yourselves each time you speak so that

7   way the transcript is clear and correct.

8        Again, this is a public courtroom, even if remote, so

9   media and the public have been known to dial in and listen to

10   proceedings and we just want you to keep that in blind.

11        Also, because there are approximately 56 participants

12   on this conference call at this time, I ask that if you are not

13   speaking or not planning on speaking, that you mute your phone.

14   We are able to tell by your phone number who has background

15   noise coming through and I won't be able to mute you if the

16   Judge instructs me to do so.  So, instead of having to point it

17   out and ask you to mute your phone by using your phone numbers,

18   we ask that you mute your phone right now at this time.

19        Does anybody have any questions before I bring in the

20   Judge?  Hearing nothing, I am bringing in the Judge.  Please

21   hold.

22        (pause)

23        THE DEPUTY CLERK:  Your Honor, this is in the matter

24   of U.S.A. v. Balde.  Counsel in the Balde case, please, state

25   your name for the record, beginning with government.

K6u5balC                        teleconference

1          MS. SLAVIK:  Good afternoon, your Honor.  Christy

2     Slavik and Kiersten Fletcher for the United States.  We are

3     joined by many colleagues including Tom McKay.

4          THE COURT:  And it is my understanding that Mr. McKay

5     is being expected to be speaker this afternoon.  Mr. McKay, is

6     that correct?

7          MR. McKAY:  I think Ms. Slavik Will take the lead role

8     but, if necessary, I will chime in, if that's okay with the

9     Court.

10          THE COURT:  That is okay with the Court.  I appreciate

11     that.

12          And then representing Mr. Balde in today's proceeding?

13          MS. WILLIS:  Good afternoon, your Honor.  Jennifer

14     Willis and Isaac Wheeler, Federal Defenders of New York on

15     behalf of Mr. Balde.  We are also joined by numerous colleagues

16     from the Federal Defenders including Annalisa Mirón who may, if

17     the occasion calls for it, have a speaking role as well.

18          THE COURT:  Thank you for letting me know and let me

19     also invite to these proceedings attorneys, both from the

20     government and from the defense side for the following cases:

21          United States v. Baker, 20 CR 288; United States v.

22     Henry, 20 CR 293; United States v. Williams, 20 CR 286; United

23     States v. Schulte, 17 CR 548; United States v. Rodriguez, 20 CR

24     301; United States v. Leonos-Perez, 20 CR 300; United States v.

25     Hightower, 20 CR 303; United States v. Simmons, 20 crim 294;

K6u5balC                         teleconference

1    United States v. Davila, 20 crim 292; and United States v.

2    Rivera, 20 CR 304.

3              Ms. Willis, is your client joining us this afternoon?

4              MS. WILLIS:  No, he is not, your Honor.  He is fully

5    aware of the steps and the efforts that we have been taking

6    with respect to the motion that we have filed but this was not

7    a proceeding that he, nor I, thought it was essential for him

8    to be at.  And so, to the extent it is necessary, I would waive

9    his presence for today's hearing.

10             THE COURT:  I had the same reaction.  It seemed to me

11   that this was some factual development preliminary to legal

12   issues and I thought it was something he either did not need to

13   be present for under the Federal Rules of Criminal Procedure or

14   he could waive his appearance and I do appreciate that.

15             Ms. Mirón, let me speak to you as well as

16   representative of other defense counsel on the line.  Do you

17   believe there is any reason for your respective clients to be

18   on this call?

19             MS. MIRÓN:  No, your Honor.  I concur with Ms. Willis

20   that this is not a proceeding which requires her presence or,

21   to the extent it is necessary, we waive our client's presence.

22             THE COURT:  Anyone who is not going to waive their

23   client's presence and believe their client needs to be on the

24   call should speak up now.  (Pause)  And, hearing nothing, I am

25   going to continue.

K6u5balC                    teleconference

1          Do I have Ms. Thomas on the line as well?

2          MS. THOMAS:  Yes, your Honor.  Linda Thomas here.

3          THE COURT:  Ms. Thomas, just because of the sheer

4   number of people on this call, I am going to ask you, please,

5   to speak up.  I am hearing a little bit of background noise and

6   I do want to make sure that the court reporter can hear you

7   over that noise.

8          Is Mr. Rogers also present from the clerk's office?

9          MR. ROGERS:  Yes, your Honor.

10          THE COURT:  Mr. Rogers, thank you, and welcome to you.

11          And apart from the attorneys, the court reporter, and

12   the folks that I have just identified from the clerk's office,

13   is there anyone else on this call?  All right.  There may be

14   folks from the press and they certainly would be welcome.

15          Ms. Thomas, I am going to take the lead, as it were,

16   in interviewing you and speaking with you about certain topics

17   that of are interest to the parties on this call and I want to

18   begin by thanking you for participating in this call and, more

19   broadly, I want to thank all of you for doing this in a single

20   call rather than in a series of calls in sequence which I think

21   would be much more difficult to manage.

22          One moment, please.  If there is something who is

23   outside and could possibly mute their phone so we are not

24   hearing it, that would be most useful.

25          Let me proceed.  Ms. Thomas, preliminary to this call

K6u5balC                    teleconference

1    I sent to you, and I hope that you did receive, certain letters

2    that were docketed in my case, they were dated June 23rd and

3    June 25th of this year and they had certain attachments.  Did

4    you in fact receive those materials?

5              MS. THOMAS:  Yes, I did, your Honor.

6              THE COURT:  Thank you.  And have you had an

7    opportunity to review them?

8              MS. THOMAS:  I have reviewed those documents.

9              THE COURT:  Let us then please begin at the beginning,

10   if we could.  Could you tell me, please, what your title is

11   within the clerk's office?

12             MS. THOMAS:  Sure.  I'm the jury administrator here in

13   the Southern District of New York.

14             THE COURT:  And is there a staff that you supervise?

15             MS. THOMAS:  Yes.  I supervise the staff of nine here

16   in the New York City office, and then we have a clerk who sits

17   up in the White Plains office.

18             THE COURT:  Okay.  Excuse me, please; one in White

19   Plains.  Thank you.

20             And if I ask you, if I phrase the questions in terms

21   of you, are you able to answer them both in terms of what you

22   personally do and what members of your staff do?

23             MS. THOMAS:  Yes.

24             THE COURT:  What does a jury administrator do?  And,

25   if you will, what do you not do?

1          MS. THOMAS:  Well, as jury administrator I obviously

2     oversee my staff, my jury clerks here, and basically I am

3     responsible for creating and -- creating pools for cases to go

4     forward.  Obviously the Judges need jurors to do the work that

5     they do.

6          So, I basically, you know, work with my staff and we

7     create what's called a master jury wheel and that is done in

8     coordination with an outside vendor along with our IT staff

9     here.  And basically what I do is I supervise the workings of

10    the jury department.  With respect to impaneling jurors, I

11    create the jury pools for jury panels, I create the pools for

12    petit jurors as well as grand jury so I do both.  I mean,

13    that's basically it.  Like I said, I supervise a staff of 9 and

14    we are responsible for qualifying jurors, summoning jurors,

15    doing the every day administerial work of that which includes

16    creating the files to have summonses mailed out, returned to

17    us, we sort through the mail.  It's a lot to oversee.

18         THE COURT:  And perhaps I would do better asking more

19    bite-sized questions.

20         For these purposes I am going to ask you, please, to

21    focus on the work of the jury administrator, by which I mean

22    you and your staff, in terms of impaneling a grand jury.  Could

23    you walk us through the steps in which -- basically, it is

24    things that you do.  You can also tell me that there are things

25    that you are not involved in.

K6u5balC                    teleconference

1          MS. THOMAS:  Sure, sure.

2          So, basically I would create the pools which would, in

3     turn, be the folks that would come in for a grand jury so

4     basically I would go, we have a jury management system, that's

5     the system that we use for me to create these pools.  These

6     pools are created from a master jury wheel and I am the one

7     that would do that.  I would, you know, there are certain

8     mechanisms in JMS and I can go in and create randomly selected

9     jury pools --

10         THE COURT:  Let me please pause you for just a moment.

11    You used the expression JMS.

12         MS. THOMAS:  Right.

13         THE COURT:  Can you tell me what that is, please?

14         MS. THOMAS:  Sure.  That stands for Jury Management

15    System.

16         THE COURT:  I see.

17         MS. THOMAS:  It is our software program.

18         THE COURT:  That is a software program.  Okay.  And

19    there are some other terms I am going to ask you about in just

20    a moment but let me let you finish explaining how it is you go

21    about impaneling a grand jury.  Thank you.

22         MS. THOMAS:  Right.  So, I create the pools and the

23    pool is created from pulling out names from our qualified

24    wheel.  So, like I said, I go in and I can create the pool in

25    JMS.  Once that pool is created, those summonses are mailed out

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K6u5balC                    teleconference

1   to prospective jurors, they receive the summons, they come in,

2   a magistrate judge presides over the actual grand jury

3   selection process so I am not part of that process but I do

4   hold responsibility for actually pooling the jurors into the

5   court house by making sure that those summons are sent out and

6   then they're brought into the court house.

7           THE COURT:  Let me please back up one moment.

8           When you say creating the pools, is it a function of

9   going to the JMS software and saying I need a panel of

10  prospective jurors of 100 and it will give you 100 names?

11          MS. THOMAS:  Exactly.  It will randomly select -- I

12  will go to click on "create pools," that's exactly what it will

13  say.  I will click on "create a pool" and it will randomly pull

14  out names from our qualified wheel to create that pool.  Once

15  that pool is created I then, in turn, have that information,

16  that data, that file sent to an outside vendor who will then

17  prepare the summonses.  So, we don't actually prepare the

18  summonses on site, we have an outside vendor to do that and

19  they're responsible for creating the summonses and actually

20  mailing the summonses out.

21          THE COURT:  And then do they give you a notification

22  that they have done so?  Do they say, *We have mailed the*

23  *summons today.*  Or are you aware that the summonses have been

24  mailed?

25          MS. THOMAS:  Yes.  Yes.  Yes.  We get confirmation,

K6u5balC                    teleconference

1   they're emailed, and they give us a confirmation that the file

2   is ready for mailing.  We give them a date that it has to be

3   mailed out by.  They then mail it by that date.  By that date,

4   no later than that date.

5          THE COURT:  And the actual putting the physical

6   summons in the mail is done by this vendor?

7          MS. THOMAS:  Exactly.

8          THE COURT:  And then sometime later the folks who have

9   received the summonses are expected to report either to a jury

10   assembly room at 500 Pearl Street or to one at White Plains; is

11   that correct?

12          MS. THOMAS:  Correct.

13          THE COURT:  I see.  At that point is there the

14   qualification process that you mentioned?

15          MS. THOMAS:  Well, right.  The qualification process

16   is prior to receiving a summons.  Usually they'll receive a

17   qualification questionnaire when we do a mailing of

18   qualification questionnaires, that's basically to find out if

19   they're actually qualified to serve, in other words do they

20   meet the criteria to actually be a juror; are they a citizen,

21   do they live in the jurisdiction, age requirement.  There are a

22   number of criteria that you have to meet to actually qualify.

23   So, that's the qualification stage.  Once we have a group of

24   people qualified we put them in what's called the qualified

25   wheel and that's where I would randomly pull names from the

1    qualified wheel to mail summonses to create pools.

2             THE COURT:  Okay.  The creating is --

3             MS. THOMAS:  It is a two-step process, right.

4             THE COURT:  But when you said earlier "I create the

5    pools," that is done from a qualified wheel and there has been

6    a preliminary step taken, namely --

7             MS. THOMAS:  Exactly.

8             THE COURT:  -- namely sending out some qualification

9    questionnaire to prospective grand jurors or jurors to ensure

10   that they may serve.

11            MS. THOMAS:  Exactly.

12            THE COURT:  Okay.  There are some terms that I want to

13   make sure I understand.  You have used the term "master jury

14   wheel."  Could you explain for my sake, as simply as you can,

15   what that is?

16            MS. THOMAS:  Well, the master jury wheel is basically

17   it's a -- it contains randomly selected names from the Voters

18   Registration Roll.  That's the source that we use to create our

19   master jury wheel and those names are randomly selected from

20   the Voters Registration Roll from each of the counties that

21   comprise the Southern District of New York.

22            THE COURT:  And if you know this, please tell me.  Is

23   it the case that the process of putting names into the master

24   jury wheel is an extraction of every registered voter from each

25   of the counties that constitute the Southern District of New

K6u5balC                        teleconference

1    York or -- you used the term random, that's why I would like to

2    be sure.  I would like to understand, does the master jury

3    wheel get all of the registered voters and from there

4    selections are made or is it something less than that?

5         MS. THOMAS:  No, it is something less than that.

6    They'll randomly -- again, everything is done randomly.  We get

7    that Voters Registration Roll and then a certain percentage of

8    names are pulled from each of the counties and so we may end up

9    with, like, 3 million to 5 million names in the master jury

10   wheel.

11        THE COURT:  I want to hear that again, please;

12   3 million to 5 million names?

13        MS. THOMAS:  Yes.

14        THE COURT:  Again, you will excuse me if I am asking

15   something that you don't know but perhaps you do.  This master

16   jury wheel that you speak of, is it constantly being updated to

17   reflect the addition or subtraction of voters from the counties

18   or is it static for some period of time?

19        MS. THOMAS:  Well, we build a new wheel every four

20   years so a master jury wheel is built every four years.  So,

21   once it is built, we use that one wheel for the four-year

22   period.

23        THE COURT:  I see.  Okay.  And so if someone moves in

24   that four-year period that's why you have the qualification

25   notices or that's why someone may get a summons or not appear

1   anymore.

2           MS. THOMAS:  Exactly.

3           THE COURT:  I understand.

4           You have also used the term "qualified jury wheel."

5   What is it, please, and are there more than one?

6           MS. THOMAS:  There is one qualified jury wheel and

7   those, that wheel consists of jurors who have been qualified to

8   serve, in other words they meet the criteria, they've been sent

9   a qualification questionnaire, it's been reviewed, and they are

10  now qualified to serve so anybody that's qualified to serve

11  they fall into this qualified jury wheel.

12          THE COURT:  All right.  And everybody is in there,

13  everybody who has been qualified is in there.

14          MS. THOMAS:  Everybody is, right.  Right.

15          So, basically when we do a qualification -- mailing of

16  the qualification questionnaire we usually do a mailing -- an

17  initial mailing of 40,000 and so 40,000 people will serve the

18  disqualification questionnaire and then from that mailing staff

19  works on qualifying these jurors and then the system can

20  automatically qualify if it meets all of the -- if the person

21  meets all of the criteria to qualify and so it would then be

22  thrown into what is called the qualified wheel.

23          THE COURT:  You have heard or you have seen the

24  government's letter to me of June 23rd and it is a letter that

25  suggests certain topics that may be discussed and it also

1    discusses certain topics as to which the defense would like to

2    have discussion.  I am asking you, if you have that letter

3    handy, to turn to page 2 of that letter.

4              MS. THOMAS:  Sure.  It is the letter dated -- I'm

5    sorry, your Honor. June?

6              THE COURT:  Well, if you actually see the header it

7    says June underscore 2020, I expect it was meant to be June

8    23rd, but page 2 that I am looking at actually has an

9    underscore where the date is.  Do you see that now?

10             MS. THOMAS:  Well, I have the letter dated June 23rd,

11   2020, if that's the one you are referring to, yes.

12             THE COURT:  So, on page 2 there is a list of general

13   topics and I am, in particular, looking at (e).  Do you see

14   that?

15             MS. THOMAS:  Yes.

16             THE COURT:  There is a reference there to a

17   "Divisional Master Wheel" and a "Divisional Qualified Jury

18   Wheel."  Are those terms with which you are familiar?

19             MS. THOMAS:  Yes.

20             THE COURT:  Could you tell me, please, what each of

21   those terms mean?

22             MS. THOMAS:  So, the additional qualified jury wheel

23   would mean the jurors that are qualified for each division in

24   the Southern District of New York.  So, New York City, the

25   court house here in New York City is Division 1.  The White

K6u5balC                    teleconference

1   Plains court house is Division 7.  So, we actually have a

2   breakdown of the qualified jurors for each division so we can

3   actually break those down where you can have a qualified wheel

4   for White Plains and a qualified wheel for the New York City

5   court house.

6           THE COURT:  Are you able to tell me what counties

7   comprise Division 1, at least for juror purposes, and what

8   counties comprise Division 7, prospective grand jurors?

9           MS. THOMAS:  Sure.  Here in New York City Division 1

10  would be the Bronx, Manhattan, Westchester, Putnam, and

11  Rockland Counties.  That would be Division 1.

12          THE COURT:  Yes.

13          MS. THOMAS:  So now White Plains would be Division 7

14  which would be Westchester, Putnam, Rockland, Dutchess, Orange,

15  and Sullivan Counties so that would be Division 7.

16          THE COURT:  I see.  So there is a little bit of

17  overlap.

18          MS. THOMAS:  And there is an overlap, right, of the

19  Westchester, Putnam, and Rockland Counties.

20          THE COURT:  Presumably, if they're selected for one,

21  they don't get immediately selected for the other division --

22          MS. THOMAS:  No.

23          THE COURT:  -- if there is indication they have been

24  selected, correct?

25          MS. THOMAS:  Right.  Once you are summoned to serve in

1    New York City this is the division that you would serve in.

2              THE COURT:  Thank you.

3              Earlier when you were speaking to me about the master

4    jury wheel, is it fair to say that adding the adjective

5    "divisional" before each of them just expresses the fact that

6    you have the capability of dividing those in the qualified jury

7    wheel and those in the master wheel into these two divisions,

8    Division 1 and Division 7?

9              MS. THOMAS:  Right.  It is already set up in there

10   that way so there are jurors that are already assigned to

11   Division 1 and there are jurors that are already assigned to

12   Division 7.

13             THE COURT:  Let me make sure I understand.  In the

14   master wheel or in the qualified jury wheel they are already

15   assigned a division?

16             MS. THOMAS:  Right.  Once they're in the master wheel,

17   again, because everything is randomly selected --

18             THE COURT:  Of course.

19             MS. THOMAS:  -- so they've already been assigned to a

20   division.

21             THE COURT:  If I am a Westchester resident when I

22   enter the master jury wheel am I simply assigned randomly

23   Division 1 or Division 7?

24             MS. THOMAS:  Yes.

25             THE COURT:  Thank you.

K6u5balC                    teleconference

1          And the same question if I were a Putnam County

2    resident or a Rockland County resident; the same?

3          MS. THOMAS:  Yes, the same.

4          THE COURT:  Thank you.

5          In that same romanette in the government's letter

6    there is reference to an AO-12 form.  Could you please explain

7    what that is?

8          MS. THOMAS:  Right.

9          The AO-12, it is basically a statistical report that

10   provides data for jury representatives so basically by your

11   race gender, ethnicity.  Those are the categories that you

12   would find in an AO-12 report so it compares a statistical

13   sampling of the jury wheels against the general population

14   data.

15         THE COURT:  I see.

16         And there is, as well, a reference to a -- actually

17   let me ask a further question about that.  Is this AO-12 form

18   something that you prepare or that your staff prepares and is

19   there some obligation that it be filed on either a periodic or

20   an event-based basis?

21         MS. THOMAS:  Right.  It is a report that we can

22   prepare via the JMS system that we have, the Jury Management

23   System that I spoke about earlier, the software that we

24   actually use; we can generate the AO-12 from the Jury

25   Management System.

K6u5balC                    teleconference

1          THE COURT:  I see.  So the event I would be thinking

2     would be some Court ordering you to produce an AO-12.

3          MS. THOMAS:  And I can produce it, yes.

4          I will add that the census a data is input into the

5     system and that's how it does the comparison.  So, yeah.

6          THE COURT:  Okay.

7          And there is a reference, as well, to JS-12 form.  Is

8     that something that is different from the AO-12 form?

9          MS. THOMAS:  It is a little different.  They are

10    similar reports, the JS-12 is another statistical report which

11    provides -- it provides the breakdown of race, gender, and

12    ethnicity of the jury wheels that we have the master and

13    qualified wheels but it is not comparing it, necessarily, to

14    the census data, it's the percentages, the breakdown percentage

15    of the actual wheels that we have.

16         THE COURT:  I see.

17         Is the JS-12 something else that is prepared on order

18    as opposed to filed annually or weekly or with any regularity?

19         MS. THOMAS:  If you need it, it is a report that we

20    can also produce via the JMS system.

21         THE COURT:  Let me ask a more pointed question.  If

22    nobody ever asked you for a AO-12 form it would not be

23    produced?  You wouldn't produce it -- absent a court order

24    there is no event that would cause you to produce such a form?

25         MS. THOMAS:  Well, those reports are specifically for,

K6u5balC                    teleconference

you know, if you need to look at that for any reason -- usually

the AO-12 is a report that you prepare that whenever you build

your jury wheel you should have an AO-12 report available.  If

somebody requests an AO-12 report, if counsel requests it, you

can produce it.  If we want to look at it and just be curious

as to what the race, gender, ethnicity, we can look at it.  So,

it is something that we can look at.  I wouldn't normally

provide it to anybody without the direction of the Court.

        THE COURT:  Fair enough.  Thank you.  Yes.

        There is another therm that is listed there, "status

codes for potential jurors."  Is that something with which you

are familiar?

        MS. THOMAS:  Yes.

        THE COURT:  I just want to ask the follow-up question:

And how are you so familiar, please?

        MS. THOMAS:  The status codes are basically the status

that a juror has, in other words if a juror is qualified, if

the juror has been disqualified, if the juror is excused, if

the juror is exempt from serving.  So, there are status codes

and it can be broken down even further.  There is a code if the

juror is exempt from serving; there is a code for that.  If the

juror is excused there is a code for that.  If the juror is

disqualified there is a code for that.  So, those are the codes

used to actually find out what that juror's status is in the

system.

K6u5balC                    teleconference

1          THE COURT:  Let's say you issue a summons as the

2    person, for whatever reason, does not appear in court in

3    response to the summons, perhaps they moved or perhaps they

4    have taken ill or some other reason.  Is there a status code

5    that is affiliated with not showing up?

6          MS. THOMAS:  Yes; it would be nonresponded.

7          THE COURT:  Nonresponded.  Thank you.

8          Going back to our earlier discussion about the work

9    that you do and your staff does in impaneling a grand jury -- I

10   think I might ask these questions a little bit differently now

11   that I understand the definitions better.  Once you have -- so,

12   there is a master jury wheel, there is then a qualified jury

13   wheel.  If, for example, you wanted to impanel a jury in White

14   Plains what you would do would be -- you would then turn to

15   what I guess is effectively the divisional qualified jury wheel

16   for Division 7?

17         MS. THOMAS:  Exactly.

18         THE COURT:  And you would ask for a certain number of

19   summonses to be prepared?

20         MS. THOMAS:  Correct.

21         THE COURT:  And, if you know, is there a general

22   number of summonses for a grand jury or does it differ by the

23   type of grand jury?

24         MS. THOMAS:  It would differ by the type of grand

25   jury.  Not that much, but basically there is a number from 90,

K6u5balC                    teleconference

1    you know, to 100, and it all depends on -- sometimes the judge

2    may want more jurors.  So, it can vary but basically there is a

3    set number, it is the special grand jury if they're going to

4    sit for a lengthy period of time you may want to summon in more

5    people as opposed to a regular grand jury that's only going to

6    sit for 30 days.

7            THE COURT:  Okay.  That makes sense.

8            So, if you know, in Manhattan what types of grand

9    juries are there?  There is the monthly grand jury; is that not

10   correct?

11           MS. THOMAS:  Correct, yes.

12           THE COURT:  Are there then special grand juries in

13   Manhattan at any given time?

14           MS. THOMAS:  We do have special grand juries and we

15   usually select the regular grand jury once a month.  If there

16   is a special grand jury needed we are usually informed of that

17   and then we will send out summonses for that particular special

18   grand jury.

19           THE COURT:  And when you are asked to impanel a

20   special grand jury -- and I am focusing on Manhattan at the

21   moment -- are you told for how long that grand jury is expected

22   to sit or do you understand that a monthly grand jury is

23   normally a month and a special grand jury is a set period of

24   time longer than one month?

25           MS. THOMAS:  Yes.  That's my understanding.

K6u5balC                          teleconference

1          THE COURT:  Is there a common length for special grand

2    juries?

3          MS. THOMAS:  I mean, it could be 18 months.  It can be

4    an 18-month grand jury and sometimes they can be extended.

5          THE COURT:  I see.

6          With respect to the White Plains division, how many

7    grand juries typically sit up there?

8          MS. THOMAS:  I want to say -- I don't -- let me look,

9    I can tell you.  It could be anywhere from three -- three or

10   four.

11         THE COURT:  And would that also be a monthly and a

12   special?

13         MS. THOMAS:  White Plains, we only select special

14   grand juries up in White Plains.  They're not selected monthly.

15         THE COURT:  They're not.  Okay.  So they're probably

16   going to go for 12 to 18 months or more each time?

17         MS. THOMAS:  Exactly, yes.

18         THE COURT:  I understand.

19         Let's say we are impaneling a grand jury beginning

20   with Manhattan.  You have now drawn down your 90 to 100

21   summonses, you have gotten those names, you have given them to

22   the vendor, the vendor sends things out, people hopefully

23   respond to the summonses, they appear in court, and you

24   mentioned that the impanelment process was conducted by a

25   magistrate judge.  Is your office involved in the impanelment

K6u5balC                    teleconference

1    of a grand jury?

2         MS. THOMAS:  Okay, no, no, no; I want to correct one

3    little thing.  When I say 90 to 100-plus jurors, those are the

4    physical bodies that we are trying to bring in.

5         THE COURT:  Ah.

6         MS. THOMAS:  The number of summonses sent out to get

7    that number --

8         THE COURT:  Yes.

9         MS. THOMAS:  -- would be different.  So, if we needed

10   100 -- let's say we needed 100 or 120 jurors to come in, I

11   would have to send out at least 400-plus summons to get 90 to

12   120 people to come in.

13        THE COURT:  So you estimate that you will need to send

14   out three to four times as many summonses as you need people?

15        MS. THOMAS:  Right; because of the percentage on the

16   return.  So, because some people will not be available, some

17   people will be disqualified for whatever reason and so you want

18   to keep that in mind when sending out the summonses.  I may

19   send out 400 summonses but all 400 of those people may not

20   necessarily be available to serve --

21        THE COURT:  Okay.

22        MS. THOMAS:  -- on the date and time.

23        THE COURT:  So you have sent out more summonses than

24   will show up in court on a particular day.  Those people who do

25   show up in court are brought to the jury assembly room in the

K6u5balC                    teleconference

1    first instance?

2              MS. THOMAS:  Correct.

3              THE COURT:  And then does this the grand jury

4    impanelment process take place there or somewhere else, if you

5    know?

6              MS. THOMAS:  The grand jury impanelment process takes

7    place in the jury assembly room.

8              THE COURT:  Okay.  And there is a magistrate judge

9    presiding over that?

10             MS. THOMAS:  Correct.

11             THE COURT:  And is there a representative of the U.S.

12   Attorney's office there?

13             MS. THOMAS:  Yes.

14             THE COURT:  If you know.

15             MS. THOMAS:  Yes.

16             THE COURT:  Is there a representative of your office

17   there?

18             MS. THOMAS:  Yes; one of my clerks is there.

19             THE COURT:  And they are there in case, for example,

20   someone is disqualified or excused for some reason?

21             MS. THOMAS:  Correct.

22             THE COURT:  Speaking about --

23             MS. THOMAS:  To keep track of who was excused.

24             THE COURT:  Very fair.

25             And so, in Manhattan at least, is it the case that

K6u5balC                          teleconference

1   they're making some indication on a list or something of people

2   who have been disqualified or excused?

3               MS. THOMAS:  Right; on the panel list.

4               THE COURT:  Okay.  And with respect to White Plains is

5   the process the same?

6               MS. THOMAS:  The process is the same.  Hello?

7               THE COURT:  Yes, I am still here.

8               MS. THOMAS:  Yes, the process is the same.  The

9   process is the same in White Plains.

10              THE COURT:  Okay.  Thank you.

11              At the end of the impanelment process is it fair to

12  say that you are advised that a certain number of people have

13  been qualified as grand jurors?

14              MS. THOMAS:  Right, have been selected; right.

15              THE COURT:  Have been selected.  Excuse me.  Thank

16  you.  You are right; They have been qualified previously.  No,

17  no, I want to be precise.

18              So, I am imagining that in a given impanelment process

19  there are some folks who are excused or discharged for one

20  reason or another.  There are some folks who become grand

21  jurors and there are some folks whose names just never get

22  called.

23              MS. THOMAS:  Correct.

24              THE COURT:  Okay.  You are then given a list of the

25  grand jurors.

K6u5balC                      teleconference

1            MS. THOMAS:  Yes.

2            THE COURT:  And is it your office's practice or

3    obligation to communicate with them about upcoming grand jury

4    proceedings if they need to be in the court or not?  Or, does

5    your work end there?

6            MS. THOMAS:  Our work, once the jury is selected our

7    work is basically done as far as when to bring them in.  The

8    only work we do at that point is to make sure they get paid for

9    the day they do report.  Basically we monitor -- we would seven

10   an attendants report as to who came in on what day.

11           THE COURT:  Okay.  Let's say, for example, that they

12   normally come in on Wednesdays and only Wednesdays because that

13   will make the hypo a little bit easier.  If they don't have to

14   come in on that Wednesday because there is no one who wishes to

15   see them, who tells them not to show up?

16           MS. THOMAS:  U.S. Attorney's office is basically in

17   control of the schedule.

18           THE COURT:  I see.  Okay.  So there is no -- I will

19   give another example.  Let's say it is a snow day and it turns

20   out the court is closed is there mechanism for advising grand

21   jurors that they don't have to go in on that day?

22           MS. THOMAS:  Again, the U.S. Attorney's office is in

23   total control of them.  Now, we do give them a general number

24   when they come in for orientation in the event, you know, that

25   there is some kind of snowstorm.  We do provide information on

K6u5balC                    teleconference

1   how they can, you know, call the court to find out if the court

2   house is opened or closed.  That's usually done when jurors are

3   first brought in and oriented.

4            THE COURT:  Okay.  But you are not calling everybody

5   up everybody the night before and saying, hey, don't forget to

6   show up.

7            MS. THOMAS:  No.

8            THE COURT:  Instead, to the contrary, after they have

9   come in they send you perhaps some means of attendance or you

10  find out that they've shown up and you then send them the money

11  to which they are entitled.

12           MS. THOMAS:  U.S. Attorney's office will usually send

13  us a copy of the attendance sheet so we receive the attendance

14  sheet of the grand jury, with the date, all of the names of the

15  jurors that appeared on that specific day -- that's what they

16  provide us -- and then we, in turn, use that attendance sheet

17  to give them attendance and to ultimately pay them for each of

18  the days that they attended.

19           THE COURT:  Okay.  All right, and then after that is

20  done is your work, with respect to a particular grand jury,

21  concluded?

22           MS. THOMAS:  Yes.  Once they're discharged we

23  obviously get notification that that grand jury has been

24  discharged.

25           THE COURT:  Yes.  That's exactly my point.

K6u5balC                    teleconference

1          MS. THOMAS:  Yes, that's the only other --

2          THE COURT:  You get notice and do what with it,

3     please?  Is there a form that indicates the --

4          MS. THOMAS:  Right.  So basically, right, we will make

5     a notation that that grand jury has been discharged.

6          THE COURT:  For grand jurors, is there a certificate

7     of completion of service that would be issued to them.

8          MS. THOMAS:  No.  We just provide them with an

9     attendance sheet.  It is, like, a letter of attendance for them

10    certifying the dates that they actually served.  So, if it is a

11    grand jury that is sitting for a lengthy period of time they'll

12    receive an attendance letter, like, every two weeks or so.  If

13    it is an 18-month grand jury we try to get them their

14    attendance letter every two weeks.

15         THE COURT:  And for the monthly grand jury is it just

16    once for the month?

17         MS. THOMAS:  It is usually still -- we still do it

18    every two weeks because most of them need it for their employer

19    so we try to do it on a bi-weekly basis.

20         THE COURT:  Okay.  Thank you for letting me know.

21         Are you working today under a particular jury plan for

22    the Southern District of New York?

23         MS. THOMAS:  Yes.

24         THE COURT:  What is the effective date of the jury

25    plan under which you are currently working.

K6u5balC                    teleconference

1          MS. THOMAS:  It is effective for February 2009.  Let

2     me just -- February 13, 2009.

3          THE COURT:  Are you reading from a particular plan

4     document right now?

5          MS. THOMAS:  It is a copy of the jury plan.

6          THE COURT:  Could you just give me the title of that

7     plan just so that we are all are aware of it?

8          MS. THOMAS:  Sure.

9          THE COURT:  Thank you.

10          MS. THOMAS:  Amended Plan for the Random Selection of

11     Grand and --

12          THE COURT:  Hold on one moment, please.  Just in

13     deference to the court reporter, if you could just read a

14     little bit slower?

15          MS. THOMAS:  I'm sorry.  Sorry.

16          THE COURT:  Thank you.  No, no.  Thank you.

17          MS. THOMAS:  Amended Plan of the Random Selection of

18     Grand and Petit Jurors in the United States District Court of

19     the Southern District of New York.

20          THE COURT:  Okay.  Now, between 2009 and now are there

21     any amendments, further amendments to that plan that exist

22     independently of the plan itself?

23          MS. THOMAS:  The only other -- it would be the two

24     orders signed by the Chief Judge recently; that would be

25     document no. 20 miscellaneous 0168, and document no. 20

K6u5balC                         teleconference

1    miscellaneous 221.

2              THE COURT:  Just so I am clear, is it fair to say that

3    before those two orders were issued you were simply working

4    with the plan effective February 13th, 2009 and it just hadn't

5    been amended; you have been working, using that plan?

6              MS. THOMAS:  Exactly.

7              THE COURT:  Okay.  And then more recently, perhaps of

8    the pandemic, there were two miscellaneous orders issued by the

9    Chief Judge that you just identified and you are now operating

10   with the plan as modified, as it were, by these two orders?

11             MS. THOMAS:  Correct.

12             (beeping)

13             THE COURT:  All right.  I'm not sure what the beeping

14   is in the background.  Hopefully it will stop soon.

15             To the extent those orders obligate you to do

16   something are you doing it?  I guess what I am really asking

17   you is are you in compliance with Judge McMahon's orders?

18             MS. THOMAS:  Yes.

19             THE COURT:  That's the easiest way to put it.  Okay.

20   Thank you.

21             MS. THOMAS:  Yes.

22             THE COURT:  I did not mean to put you on the spot.

23             MS. THOMAS:  No.  No.

24             THE COURT:  All right.

25             I am imagining that there are different types of

K6u5balC                    teleconference

1    records that you maintain.  We have already talked about the

2    master jury wheel, we have talked about the qualified jury

3    wheel, we have talked about the AO-12 and JS-12 form that can

4    be generated from information that you have.  We have talked, I

5    suppose, about the attendance reports and the letters of

6    attendance.  Are there other documents that you can think of

7    that you maintain to keep tabs on grand jurors?

8            MS. THOMAS:  No, I don't think there are any other

9    documents to keep tabs on grand jurors; no.

10           THE COURT:  What I would like to do, please, is to ask

11   you, if you could, to turn to a document that is labeled

12   attachment 1 at the back of government's letter of June 23rd

13   and I believe it is two pages long and has 22 topics on it.  Do

14   you have that handy?

15           MS. THOMAS:  Yes.

16           THE COURT:  Some of these things I believe you have

17   answered already but the point of today's discussion is to see

18   if there are documents responsive or if there are documents

19   responsive to these types of categories.  So, beginning with

20   the first you have told us now what the jury plan is, fair to

21   say?

22           MS. THOMAS:  Yes.

23           THE COURT:  And with respect to questions 2 and 3 it

24   would seem to me that the only orders of which you are aware

25   that have changed the plan are the two miscellaneous orders

K6u5balC                      teleconference

1    from Judge McMahon that were issued this year.  Also fair to

2    say?

3              MS. THOMAS:  Yes.

4              THE COURT:  With respect to my case which is United

5    States v. Balde, would you happen to know what grand jury

6    division was chosen or what grand jury division was the

7    division that issued the indictment in my case, if you know?

8              MS. THOMAS:  Division 7.

9              THE COURT:  Division 7 is the White Plains grand jury,

10   yes?

11             MS. THOMAS:  Yes.

12             THE COURT:  If you happen to know, is there today, as

13   I am talking to you, a jury sitting in Manhattan -- a grand

14   jury sitting in Manhattan?

15             MS. THOMAS:  No.  Not to my knowledge.

16             THE COURT:  Do you happen to know when was the last

17   time that a grand jury sat in Manhattan?

18             MS. THOMAS:  I believe it was March 26th.

19             THE COURT:  Of this year?

20             MS. THOMAS:  Of this year.

21             THE COURT:  Is it fair to say then that indictments

22   that were returned after that date were almost certainly

23   returned by the White Plains division grand jury?

24             MS. THOMAS:  Yes.  I would probably say yes to that.

25             THE COURT:  The answer is if you don't know then you

K6u5balC                    teleconference

1    don't know.

2                  MS. THOMAS:  Yes.

3                  THE COURT:  Certainly.

4                  MS. THOMAS:  There were no grand juries sitting here

5    in Manhattan after March 26th.  Anything happening thereafter,

6    if there is a grand jury sitting in White Plains I would make

7    that assumption.

8                  THE COURT:  Okay.  Do you or anyone in your, of your

9    staff, choose what grand jury the government goes before?

10                 MS. THOMAS:  No.

11                 THE COURT:  Do you have any knowledge of it

12   beforehand?

13                 MS. THOMAS:  No.

14                 THE COURT:  You know afterwards because you have

15   gotten an attendance record; is that fair?

16                 MS. THOMAS:  We have gotten the attendance records;

17   exactly.

18                 THE COURT:  Okay.

19                 So you wouldn't -- there is attachment 1 has a topic

20   no. 6.  You have no knowledge of the choice of a particular

21   jury division?

22                 MS. THOMAS:  Right.  I have no knowledge of that.

23                 THE COURT:  Okay.  With respect to topic 7, I think I

24   am understanding you to say that you can create an AO-12 form

25   or a JS-12 form; is that correct?

K6u5balC                    teleconference

1              MS. THOMAS:  Yes.

2              THE COURT:  All right.

3              With respect to topic 8, other than -- and again you

4    will excuse me if I am misperceiving the information that you

5    have -- the AO-12 and JS-12 come from information that is

6    ultimately contained in the master jury wheel; is that fair to

7    say?

8              MS. THOMAS:  Yes.

9              THE COURT:  Is the qualified jury wheel, can it be

10   seen as a subset of the master jury wheel in terms of its

11   information?

12             MS. THOMAS:  Exactly.

13             THE COURT:  Exactly.  So, if you wanted the broadest

14   amount of information, the master jury wheel would have

15   everything that would be in the qualified jury wheel and,

16   indeed, everything that would be in the AO-12 form or the JS-12

17   form.  Is that fair to say?

18             MS. THOMAS:  Yes.

19             THE COURT:  Other than that information, if you look,

20   please, at topic 8, do you have any other statistical or

21   demographic analyses of which you are aware?  And I will let

22   you read the topic to make sure that I am not misstating the

23   inquiry.

24             MS. THOMAS:  Yes, we have no other statistical or

25   demographic analysis that we utilize.

K6u5balC                          teleconference

1              THE COURT:  Okay.

2              Would you happen, for topic no. 9, this information

3      about the refilling of the master jury wheel, we talked earlier

4      about every four years.  Am I remembering that part of our

5      discussion correctly?

6              MS. THOMAS:  Yes.  Yes.

7              THE COURT:  I don't know that you can tell me today

8      when it was refilled.  Is there a document that would contain

9      that information?

10             MS. THOMAS:  It was February of 2017.

11             THE COURT:  Oh, you just happened to know that?

12             MS. THOMAS:  Yes.  It is the wheel we are working with

13     now so I know.

14             THE COURT:  No, no.  I appreciate the knowledge.

15     Thank you.

16             With respect to topic no. 10 -- if you see topic

17     no. 10 -- other than the documents that we have been talking

18     about today, are there other records that you would have

19     responsive to no. 10?

20             MS. THOMAS:  I would have the record of steps that I

21     would be provided by the vendor that actually is responsible

22     for building our wheel.

23             THE COURT:  So the vendor keeps some record of the

24     work that the vendor does in putting together the wheel?

25             MS. THOMAS:  Right.  It is basically what is outlined

K6u5balC                    teleconference

1    in our jury plan, the steps, and so he follows the steps that

2    are outlined in the plan.

3              THE COURT:  That's the interesting question.

4              MS. THOMAS:  Yes.

5              THE COURT:  Let's say the plan outlines some steps and

6    it would be expected and hoped that the vendor would abide by

7    them and you are telling me that the vendor does.  The records

8    that the vendor has, are they anything more than saying:  *I*

9    *abided by these steps.*  Or are they any more detailed than

10   that?  If you have seen them.

11             MS. THOMAS:  Basically, he refers to the steps in the

12   jury plan.

13             THE COURT:  Okay, but they are written confirmations

14   for you or electronic confirmations for you that the steps were

15   followed?

16             MS. THOMAS:  Yes.

17             THE COURT:  And these are documents that you have in

18   some format.

19             MS. THOMAS:  Right.  I have confirmation from him,

20   from the vendor himself.

21             THE COURT:  I see.

22             Is there a name to those forms?

23             MS. THOMAS:  Well, the name of the vendor is Sutera.

24   Michael Sutera is the actual vendor and I think the name of

25   the --

K6u5balC                    teleconference

1          THE COURT:  May I have the spelling of the last name,

2     if you know?

3          MS. THOMAS:  Sure.  S-U-T-E-R-A, and it is Sutera Data

4     Systems.

5          THE COURT:  Thank you.

6          Does he call those forms anything?  Does he call them

7     confirmation forms?  Does he have a number attached to them?

8     And if you don't know, that's fine.

9          MS. THOMAS:  I wouldn't know.  It is just a relay of

10    information basically just telling me he followed the steps as

11    outlined in the plan.

12         THE COURT:  With respect to topic 11 returning to the

13    list of topics, is there a notice?

14         MS. THOMAS:  Yes, there is.  Yes.

15         THE COURT:  And you would keep a record of those

16    notices?

17         MS. THOMAS:  Right.  And the notice is available,

18    that's the notice that we -- I believe it may even be online

19    but we do have that notice, yes; it is available.

20         THE COURT:  Is it updated with any frequency?

21         MS. THOMAS:  We do it -- every time we build the new

22    wheel we do it.  There is also a notice that goes out that's

23    every three or four months that we will send out certifying the

24    pool so all of those notices are available.

25         THE COURT:  Okay.  And is it fair to say that these

K6u5balC                    teleconference

notices that we are now talking about, these notices particular
to the building of a new wheel, notices that are certifying a
pool, these are not in the master jury wheel or qualified jury
wheel, these are just other forms that you have?

MS. THOMAS:  Right.  These are other forms and
documents.

THE COURT:  Okay, great.  Then, topic no. 12, might
there be documents that you haven't mentioned that would
contain this information?

MS. THOMAS:  We do have a document for item no. 12 for
the calculation of the division of jurors which we get from our
vendor.

THE COURT:  Okay.  If I can ask you, please, to turn
to topic 13?  Are there documents that you have for jurors who
do not respond or for whom the form is returned?  I am not
asking what you do, I guess I am asking is there a document
somewhere that outlines what to do when that happens.

MS. THOMAS:  It would be -- that would be outlined in
the jury plan.

THE COURT:  It would be in the jury plan.

MS. THOMAS:  Right.  Well, if a person failed to
respond we can look at the jury plan Article III, Section E.

THE COURT:  Okay.

MS. THOMAS:  Paragraph 2, right.

THE COURT:  Thank you.

K6u5balC                    teleconference

1              And other than that part of the jury plan, is there

2      another document of which you are aware that outlines what the

3      procedures are?

4              MS. THOMAS:  Just the plan.

5              THE COURT:  Okay.  And I should ask a better question.

6      Separate and apart from any written documents is there a

7      practice that no one bothered to commit to writing in this

8      instance or is it all in the plan?

9              MS. THOMAS:  It would be in the plan.

10             THE COURT:  Okay.  So the information would be in the

11     plan.

12             With respect to No. 14, I am thinking specifically of

13     the grand jury that returned the indictment in my case, in the

14     Balde case, but I suspect just looking at the docket numbers

15     attached to the other -- to the indictments that are discussed

16     like folks who are on this phone call, that it may be from the

17     same grand jury but, in particular, would you happen to know

18     when the grand jurors were summoned for the grand jury that

19     returned the indictment in my case?

20             MS. THOMAS:  The date when grand jurors were summoned

21     you said?

22             THE COURT:  That's fine.  It is fine if you don't

23     know.

24             MS. THOMAS:  The date that they were summoned was

25     November, I believe it is November 2019.

K6u5balC                    teleconference

1          THE COURT:  Is there a document that tells you that?

2          MS. THOMAS:  Yes.  I checked with my grand jury clerk

3   and she keeps records of the grand jurors that are sitting up

4   in White Plains.

5          THE COURT:  Okay.  So if I were to ask you, you would

6   be able to produce documents indicating the date on which those

7   grand jurors were summoned?

8          MS. THOMAS:  Yes.

9          THE COURT:  If you look at topic 15, you would also be

10  able to identify how many folks were summoned to be considered

11  as grand jurors for that particular grand jury?

12         MS. THOMAS:  Yes.

13         THE COURT:  And, indeed, for any of the grand juries?

14         MS. THOMAS:  Yes.

15         THE COURT:  Okay.  With respect to topics 16 and 17,

16  is this information that might be in the master jury wheel?

17         MS. THOMAS:  Yes.

18         THE COURT:  I should have asked about 18.  Might that

19  also be in there?

20         MS. THOMAS:  Yes, that's part of the wheel; yes.

21         THE COURT:  And I should -- no, I do see it, okay.

22         And for topic 18, is this information contained in the

23  master wheel or somewhere else?

24         MS. THOMAS:  The status codes, yes.  We would have it

25  in the JMS system.

K6u5balC                    teleconference

1    THE COURT:  And for topic 19?  I am thinking 19 is

2    specific to the grand jury in my case which I understand to be

3    the Division 7 White Plains grand jury that was impaneled in

4    November of 2019 based on what you have just told me.  They

5    were summoned -- they were summoned -- excuse me, in November

6    of 2019, I don't know when they were impaneled.  Are you able

7    to identify the juror numbers for those persons selected as

8    grand jurors in my case?

9         MS. THOMAS:  I'm sorry, Judge.  Can you repeat the

10   question?  I'm sorry.

11        THE COURT:  Of course.  No, no.  That's okay.  My

12   imprecision may just reflect my own confusion about the

13   question.

14        Let's speak more broadly -- no, I will start narrow

15   and then I will go broad.  With respect to the grand jury that

16   returned the indictment in my case, if you wanted to identify

17   the juror numbers of those grand jurors would be able to do so?

18        MS. THOMAS:  Yes.

19        THE COURT:  And, more broadly, with respect to any

20   grand jury that is currently sitting, if you imagine that there

21   were multiple grand juries sitting in White Plains and

22   Manhattan right now, would you be able to identify the juror

23   numbers for each person selected?

24        MS. THOMAS:  Yes.

25        THE COURT:  For question 20, if I may understand, I

K6u5balC                     teleconference

1   think I understood you earlier to be saying that the source of

2   the data were voter rolls, correct?

3                MS. THOMAS:  Correct.

4                THE COURT:  For the constituent counties --

5                MS. THOMAS:  Correct.

6                THE COURT:  -- of the Southern District of New York?

7   And so, to remind myself of what we discussed a little while

8   ago, from time to time there will be information taken on a

9   random basis from the county voter rolls, correct?

10                MS. THOMAS:  It is done once.

11                THE COURT:  Once every four years?

12                MS. THOMAS:  Right.  Right.

13                THE COURT:  Thank you.  See?  I did remember.  Thank

14   you.

15                MS. THOMAS:  Right.

16                THE COURT:  So, right now, today, you have a master

17   jury wheel from November of -- no, from February of 2017?

18                MS. THOMAS:  Correct.

19                THE COURT:  And that is the information that is

20   contained there.

21                Are you able to access the particular juror

22   qualification and juror summons forms for those folks who were

23   summoned or who sought to be qualified to be grand jurors in my

24   case?

25                MS. THOMAS:  Right.  We can provide the qualification

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K6u5balC                    teleconference

1    questionnaires for grand jurors in your case, yes.

2              THE COURT:  And with respect to those that did not

3    make it to my grand jury or to anyone's grand jury is it likely

4    that there are documents in your office that reflect those

5    folks who were excused or deferred or disqualified or, in my

6    case, selected?

7              MS. THOMAS:  Correct.

8              THE COURT:  I would like to get a sense, if I could,

9    about the universe of documents we are talking about and it

10   sounds like there are several types of documents.  It sounds

11   like there is a master jury wheel which has information on

12   several million prospective jurors.  Am I overstating that

13   issue?

14             MS. THOMAS:  No, that's correct.

15             THE COURT:  Okay.  And it is maintained in electronic

16   form, yeah?

17             MS. THOMAS:  Correct.

18             THE COURT:  And then separately there are forms that

19   have been prepared attendant to the impanelment of a particular

20   grand jury so maybe there is a form relating to the

21   qualification of jurors.  There is, in fact, the qualification

22   questionnaire that was sent out, there were summons that were

23   issued, and then there are records that reflect at a more

24   individualized level the folks who were selected as grand

25   jurors and what they did, for example, the days they attended

K6u5balC                    teleconference

1    and the fact that they were paid?  Is that a fair statement?

2             MS. THOMAS:  Yes.

3             THE COURT:  I have tried to identify all of the types

4    of documents that might be in your possession -- meaning your

5    office's possession.  Are there other documents that I simply

6    don't know enough to request from you?

7             MS. THOMAS:  I think this, the list covers all of the

8    documents that we would have available to provide.

9             THE COURT:  Thank you very much.  And, again, I know

10   this call has been going on for a while.  I very much

11   appreciate your willingness to sit with us this afternoon and

12   explain it to us and I appreciate all of the work that you have

13   done in reviewing this material.

14             Ms. Willis, should I be addressing you or Ms. Mirón?

15             MS. WILLIS:  I think both of us your Honor.  I was

16   sending a message to her to see if there was any follow up or

17   anything we wanted clarity on and have yet to hear back.

18             THE COURT:  Okay.  Let me ask you this.  I think as a

19   result of this conversation there is a better sense of the

20   universe of documents that are out there.  I can ask, and I

21   will ask about the relative ease with which these documents can

22   be obtained but I think I was trying to trying to figure out,

23   in light of some of Ms. Thomas' answers, whether your office

24   was going to be seeking, for example, information specific to

25   the White Plains divisional wheels, be they master or

K6u5balC                    teleconference

1    qualified, or something broader than that.

2                MS. WILLIS:  Your Honor, I think the answer to that is

3    likely both in the sense that obviously we have now learned

4    from Ms. Thomas that Mr. Balde, and it sounds like everyone

5    else who has indicted recently, would have been indicted out of

6    that Division 7 wheel but I think that the data that the expert

7    may need might be to include both in the sense that he is

8    obviously doing a statistical comparison between the data that

9    is generated out of the White Plains wheel and the sort of

10   census data for New York broadly.  I haven't directly put the

11   question to him of whether or not the entire Southern District

12   wheel would factor into that analysis.  Obviously if it is

13   something that he doesn't need we can certainly ask him and

14   then refer that back to the Court, and certainly something that

15   is unnecessarily complex for Ms. Thomas and her staff to

16   assemble it, I don't want her to assemble data that has no

17   purpose.  But, just from hearing her analysis and explanation

18   of how this all works, it seems to me that both sets of data

19   may be relevant but, again, I would have to follow up with my

20   expert.

21                Your Honor, there was one particular follow-up

22   question I did have, if I may?

23                THE COURT:  You can ask me and I will decide whether I

24   ask Ms. Thomas.  Thank you.

25                MS. WILLIS:  Certainly, your Honor.

1          It was with respect to the discussion about the AO-12

2     and the JS-12 form.  I certainly understood the comments to be

3     saying that those can be produced upon request and her office

4     would be able to produce those but when you were having

5     discussion with her about whether or not those documents are

6     produced at any other time, basically are they produced as a

7     matter of course, is there some type of a periodic time or

8     perhaps an AO-12 form is generated and then her office looks at

9     it or stores it in some way, that was my question.  Because I

10    think if there had been other -- it is one thing to generate

11    the reports now -- and I understand that they can do that --

12    but if previously, during the course of the three years that

13    the current wheel has been composed, if previously that

14    document has been generated and therefore stored in some way, I

15    think we would want to know that and have access to those

16    records as well, if they exist.

17          THE COURT:  All right.

18          Ms. Thomas, just to follow up on what Ms. Willis was

19    discussing with me, is it the case that an AO-12 or JS-12 is

20    generated in connection with the building or refilling of a

21    master jury wheel?

22          MS. THOMAS:  Yes.

23          THE COURT:  So there is likely to be an AO-12 -- I'm

24    sorry.  I will let you finish.  Go ahead.

25          MS. THOMAS:  Right.  It is done for once you build the

K6u5balC                    teleconference

1    wheel, the initial mailing, it is usually done then after you

2    do your initial mailing.

3              THE COURT:  So, is it fair to say sometime at or about

4    February of 2017 there was an AO-12 and/or a JS-12 prepared?

5              MS. THOMAS:  Likely, yes.  Yes.

6              THE COURT:  Let me ask the question a bit differently.

7              We all now understand that you can generate either of

8    knows forms upon Court order --

9              MS. THOMAS:  Right.

10             THE COURT:  -- I can order you to do so.  Do you

11   happen to have any that are specific to this particular master

12   jury wheel that you have around either because you put them

13   together in connection with the building of this jury wheel or

14   because some other Judge somewhere ordered you to produce this

15   information?

16             MS. THOMAS:  Yes.  I have been ordered by another

17   Judge to produce it.

18             THE COURT:  Is it fair to say that you keep a record

19   of every AO-12 and every JS-12 that, for whatever reason, you

20   put together?

21             MS. THOMAS:  Yes.

22             THE COURT:  Let me ask the question a little bit

23   better.  Excuse me.

24             Let's imagine that a Judge not surnamed Failla asked

25   you last year to put together an AO-12 or JS-12 and you did so

1    because you complied with the Court order.  Did you keep a copy

2    for yourself?

3              MS. THOMAS:  Yes.  Yes.

4              THE COURT:  So, if you are ever ordered to put that

5    together you do keep a copy of what you have been ordered to

6    produce.  Fair to stay?

7              MS. THOMAS:  Yes.

8              THE COURT:  All right.  So, if -- if -- and I am not

9    saying I would grant it but if the defense were to ask you for

10   all of the AO-12s and JS-12s that have been generated with

11   respect to the current master jury wheel, you would have that

12   information somewhere?

13             MS. THOMAS:  Yes.

14             THE COURT:  Ms. Willis, have I obtained from

15   Ms. Thomas the clarification that my earlier questions did not

16   provide?

17             MS. WILLIS:  Yes, you have.  Thank you very much, your

18   Honor.

19             THE COURT:  Okay.

20             Ms. Thomas, one other thing that I think I would like

21   to talk about with you and then perhaps it makes sense to have

22   the parties talk about what actually they want because I think

23   I understood from Ms. Willis is that I'm not sure today she

24   knows precisely what her expert needs.  Some of this

25   information is maintained in paper and some of it maintained

K6u5balC                        teleconference

1   electronically?  Is that fair to say?

2              MS. THOMAS:  Yes.  Jurors that did not take advantage

3   of filling out the qualification questionnaire online via our

4   e-juror website and may have filled out an actual paper

5   questionnaire.  So, in that instance it may be paper and/or

6   electronically filled out.

7              THE COURT:  So, for folks who get the qualification

8   questionnaire, some of them will fill it out electronically and

9   you will have those copies electronically.  Some of them fill

10  it out on paper and you will receive from them the paper copy,

11  correct?

12             MS. THOMAS:  Correct.  Correct.

13             THE COURT:  Do you store the paper copies somewhere?

14             MS. THOMAS:  Yes.  Yes, we do.

15             THE COURT:  But it is fair to say they're not merged

16  in with the electronic data because they exist in different

17  format.  Is that fair to say was well?

18             MS. THOMAS:  Yes.

19             THE COURT:  So you have electronic versions and you

20  have got paper versions.

21             If I asked you about the amount, the volume of paper

22  reports that you have that might be responsive to the topics we

23  have been addressing, are we talking about a file cabinet?  Are

24  we talking about a box?  Are we talking about two pieces of

25  paper?  Do you have any idea?

K6u5balC                          teleconference

1           MS. THOMAS:  Well, if we are just focusing on that one

2     specific pool that the grand jury was selected from I don't

3     think it would be a file cabinet.

4           THE COURT:  Okay.  But, if we are asking for all grand

5     juries from this master jury wheel then it will be different,

6     it will be more?

7           MS. THOMAS:  It would be more.

8           THE COURT:  Okay.  And is it fair to say that these

9     paper documents do not exist in a redacted format in the sense

10    that you would have somebody -- you or someone -- would have to

11    go in and redact personal identifying information from these

12    materials?

13          MS. THOMAS:  That is correct.

14          THE COURT:  All right.  With respect to the

15    electronics so the master jury wheel electronic, correct?

16          MS. THOMAS:  Correct.

17          THE COURT:  The qualified jury wheel, electronic?

18          MS. THOMAS:  Correct.

19          THE COURT:  A number of juror qualification

20    questionnaires electronic?

21          MS. THOMAS:  Yes.

22          THE COURT:  The summonses, do you have electronic

23    versions of them?  Do you have an electronic version of what

24    your vendor sent out?

25          MS. THOMAS:  When you say that do you mean --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

K6u5balC                    teleconference

1          THE COURT:  The actual thing, the summons, the paper
2     work that gets you to come in on a particular day, I don't
3     imagine that you have retrieved from everyone to whom you sent
4     it the paper copy that caused them to come in but do you get
5     from your vendor either a copy of the form, even if not
6     every -- the thousand of them that were sent out but at least a
7     copy of the summons form?
8          MS. THOMAS:  Yes, he provides samples to us to make
9     sure that everything is correct.
10          THE COURT:  He doesn't provide, in electronic or paper
11     form, every single summons that he sends out?
12          MS. THOMAS:  No.
13          THE COURT:  Okay.  All right.
14          With respect to the master wheel which has a lot of
15     this electronic information, is it fair to say that personal
16     identifying information can be redacted from it?
17          MS. THOMAS:  Yes.
18          THE COURT:  And is it a situation of going into each
19     individual file and blacking out something in a computer sense,
20     or is it a situation where you can generate information -- you
21     can omit categories of information from a production of
22     electronic information.
23          MS. THOMAS:  Right.  I would not be able to do it but
24     an IT specialist would be able to create an Excel spreadsheet.
25          THE COURT:  That omits the identifying information?

K6u5balC                         teleconference

1           MS. THOMAS:  Right, that would leave out that

2    identifying information.

3           THE COURT:  But we don't, today, have a sense of how

4    long it would take said IT person to do that; fair enough?

5           MS. THOMAS:  Fair enough.

6           THE COURT:  If you had to imagine how long it would

7    take to produce this information, let's go with the -- I won't

8    say the worst case scenario, I will say the broadest case

9    scenario -- the master jury wheel and all of the paper stuff

10   that would be in your office or your staff's office, do you

11   think it could be done in a month?  Do you think it could be

12   done in six weeks or do you not want to hazard a guess at this

13   time?

14          MS. THOMAS:  I am guessing it can be done in a month.

15          THE COURT:  It couldn't be done tomorrow, fair enough?

16          MS. THOMAS:  Fair enough.

17          THE COURT:  Okay.  Very good.

18          Ms. Willis, I do think it makes sense for you to

19   perhaps to caucus with the other defense counsel and to speak

20   with the expert about what is needed.  I would hate to put

21   Ms. Thomas and her staff through providing information that's

22   not ultimately useful.

23          Do you agree, Ms. Willis?

24          MS. WILLIS:  Yes, I do.

25          Two things, your Honor.  One, Ms. Mirón has sent me a

K6u5balC                    teleconference

1   message that she did have one follow-up question that she would

2   like to pose to the Court.  I wanted to let you know that.

3   Number two, I think your Honor is right that having defense

4   counsel speak and obviously finding out from our expert exactly

5   what is essential and what we need.  The other thing that we

6   may be able to talk to him about as well is -- and he had

7   mentioned this to us sort of in a planning call some time

8   ago -- whether there are certain ways that documents, records

9   could be produced that might be easier.  So, he sort of needs

10  the data but there might be a variety of different methods in

11  which it could be produced, some of which it might be easier

12  for the jury administrator and her staff to generate.  So,

13  perhaps we can also find out from him a list of here is two or

14  three options for how the data can be generated and then

15  whichever they find the easiest they could utilize.  We don't

16  want to create additional work when not necessary.

17          THE COURT:  I do understand.

18          Would you happen to know Ms. Mirón's question or

19  should I be asking her directly?

20          MS. WILLIS:  I do not know it, your Honor, so if you

21  could address her, please?

22          THE COURT:  Of course.

23          Ms. Mirón, a follow-up question?

24          MS. MIRÓN:  Yes, your Honor.

25          I just wanted to be certain about -- the grand jury

1    that was drawn from the Manhattan division, in other words

2    Division 1 that is sitting now, because I know that a number of

3    defense counsel on this call, a few of them have received

4    notice that the grand jury that indicted their client was

5    pulled from a Manhattan pool but perhaps sitting in a different

6    location like in White Plains, and I know Ms. Thomas indicated

7    that there is not a grand jury drawn from the Manhattan pool so

8    I wanted some clarity on that, if possible.

9              MR. McKAY:  Judge?

10             THE COURT:  Is this Mr. McKay?

11             MR. McKAY:  Yes; Mr. McKay from the government.

12             THE COURT:  Okay.  I will hear from you and then I

13   will speak with Ms. Thomas.  Thank you, sir.

14             MR. McKAY:  So, just to clarify.  I think when

15   Ms. Thomas was asked about whether there were any grand juries

16   in Manhattan since the COVID breakout, I think she had said

17   that her assumption was that there had been not and that was

18   true until about a week or so ago but we have had at least one

19   grand jury sit in Manhattan and I believe, but obviously

20   Ms. Thomas will be the person to confirm once you look at her

21   records, that that was something that was drawn from the

22   Division 1.  And so there may be some cases or defendants on

23   this call who were indicted in Manhattan but I actually don't

24   know which particular cases that is true for.

25             THE COURT:  And Mr. McKay, to the best of your

K6u5balC                          teleconference

1    understanding, any grand jury sitting in White Plains was not

2    comprised of Manhattan residents, you are simply speaking of a

3    grand jury that sitting in Manhattan in the very recent past?

4                 MR. McKAY:  Right.  My understanding is that as

5    recently as a week ago we had a Manhattan grand jury sitting in

6    Manhattan and that it is possible that some of the jurors from

7    northern counties who were on that grand jury used the video

8    teleconference to participate but I don't know the particulars

9    of any particular sitting or case and I think that this is a

10   question that we can answer for specific defense counsel in the

11   relevant cases if they ask.

12                THE COURT:  All right.  Thank you.

13                Ms. Thomas, are you aware of any grand juries sitting

14   in Manhattan in the last week or so?

15                MS. THOMAS:  I haven't received any attendance but --

16   that I'm aware of.  I will have to check with my staff to see

17   if any New York City grand jury sat last week.  I would have to

18   check.

19                THE COURT:  Sure.

20                Ms. Mirón, what is the best way of communicating that

21   information?  Should Ms. Thomas get back to me and will -- I

22   think there may have been a mass e-mail to folks earlier today

23   about the timing of this call.  Should we advise folks of what

24   Ms. Thomas tells us later on today or tomorrow?

25                MS. MIRÓN:  Yes, your Honor; and Ms. Willis and I can

K6u5balC                    teleconference

1    make sure that everyone we know of receives the information.

2           THE COURT:  All right.

3           As well, Mr. McKay, are there folks from the

4    government's side who could tell us that they obtained an

5    indictment from a grand jury sitting in Manhattan?

6           MR. McKAY:  Yes, your Honor.

7           I think the best way for this to be handled, from our

8    perspective, would be for the defense counsel in any given case

9    to ask the AUSA handling their case: *Where was my guy*

10   *indicted?  Was it in Manhattan or was it in White Plains?*  And

11   the AUSA in their respective case can answer that question.

12   And then, to the extent that there is some question about where

13   the grand jurors were drawn from, I think that is responsive or

14   likely encompassed within the list of questions that have been

15   provided in the Balde case and have been provided in

16   substantially similar form in all of these other cases and so

17   Ms. Thomas is presumably going to have records that confirm

18   that for each relevant case.

19          THE COURT:  Okay.  And so, Ms. Thomas, perhaps after

20   this call ends you and I can speak later on this afternoon when

21   you have had a chance to consult with your staff.  Does that

22   make sense?

23          MS. THOMAS:  That's fine because we usually, like I

24   said, we usually receive notifications from the U.S. Attorney's

25   office with the attendance sheets for which jurors sat.  So, we

K6u5balC                          teleconference

1    have to check to see if we receive any attendance from any

2    juries sitting last week.

3            THE COURT:  Mr. McKay, from your answer I am also

4    understanding that if any defense counsel asks the question

5    about the use of video or participation by video that the

6    particular AUSA on the particular case would be able to answer

7    that question in a manner that, candidly, Ms. Thomas and I

8    cannot; is that correct?

9            MR. McKAY:  That's correct, your Honor.

10           THE COURT:  Mr. McKay, more broadly would you be able

11   to consult with or work with Ms. Willis or Ms. Mirón or others

12   in your office to tell me if there is agreement on the types of

13   records and information that you would like -- that the defense

14   would like Ms. Thomas to produce?  I didn't want to make any

15   decisions now while folks -- while there is still a need to

16   speak with the consulting expert for the defense to see what

17   information is necessary.  My hope was that the parties could

18   speak about it and that, at least for the Balde case and

19   perhaps for these other cases, if their judges don't mind, I

20   can resolve those issues.

21           MR. McKAY:  Yes, your Honor.

22           From the government's perspective, we think it makes

23   sense to give us a period of time for defense counsel to speak

24   to their experts about what specifically they need and then for

25   the government and defense counsel to meet and confer about

K6u5balC                    teleconference

what documents defense is requesting and what, if any,

objections the government has to those requests and then we can

submit the joint status letter saying either we have agreed or

we have agreed on some things and here is the scope of any

dispute.  And I think it does make sense for that to happen in

the Balde case because it is sort of the first case presenting

this and your Honor has already taken the lead and so what I

would propose is that defense counsel and government counsel in

Balde meet and confer on this and submit this joint letter.

Obviously, if defense counsel in the other cases have requests

that are different than what Balde is requesting, those can be

addressed in the particular case but I think that the universe

of different requests is very, very small, that the requests

involved here are substantially everything that have been asked

in the other cases and so it makes sense to resolve that here

and then any ancillary disputes can be taken up in the relevant

cases.

          THE COURT:  I don't wish to speak for my fellow

Judges.  They were willing to have me administer this call.

Whether they would be willing to have me decide other issues I

can't say.  But, I think in the first instance I am expecting

that there will be commonality in the documents sought from the

defense side and therefore I presume the government's responses

would also be similar, if not, identical.  So, Ms. Willis, does

it make sense for you and whomever to speak with your expert to

K6u5balC                    teleconference

1    decide the universe of documents and materials that you want,

2    to speak with the government, and then to come back to me?

3            MS. WILLIS:  Yes, your Honor.  Two things.

4            One, obviously you are the Judge presiding over my

5    case so I certainly have no objection to coming back to your

6    Honor with whatever joint letter or list of things we have

7    agreed on and things that they're objecting to that we have

8    generated.  I can't, obviously, universally speak for other

9    defense counsel.  I do think the government makes a good point

10   that to the extent there are sort of general issues that all

11   parties can agree on, I certainly could learn that and let your

12   Honor know that as well, so to the extent that other Judges are

13   willing to let your Honor's decision in Mr. Balde's case also

14   affect their cases, I have no problem coordinating with other

15   defense counsel but, obviously, I can only specifically speak

16   for Mr. Balde who is my client.

17           THE COURT:  Of course.  And all I am saying is I want

18   to be -- I would like to come to Ms. Thomas once requesting

19   materials and not nine different times for nine different

20   things and I could not ask you to speak on behalf of all

21   defense counsel, nor could I speak on behalf of all judges.  I

22   will simply let the Judges of whom I am aware know that we have

23   had this call today, that it is expected that folks -- that

24   defense counsel, the group will meet and discuss the documents

25   that they want, that there might be some things that might be

K6u5balC                    teleconference

1    common among other all cases and that I could hear if there are

2    disputes in those cases but there may be things that ought to

3    be brought to the specific Judge that are unique to particular

4    case.

5            So, again, I am trying, I am offering myself to try

6    and help matters and to try and limit the administrative

7    wrinkles for Ms. Thomas but I do understand that each side has

8    their own client and these cases have their own judges.

9            So, Ms. Willis, what are you thinking time wise?  How

10   long would it take you to get back to the government and then

11   get back to me?  Is this a 30-day venture?

12           MS. WILLIS:  No, not at all, your Honor.  I think

13   that -- I don't have a sense of anyone else's calendar or the

14   expert's but I am confident that within a few days, a week at

15   the most, I think probably not even that long, we will be able

16   to confer amongst ourselves, confer with the expert, and also

17   reach out to the government.

18           Now, if there is a lot of difference, if there is a

19   lot of space between what we are asking for and what the

20   government is agreeing to then perhaps this becomes more of a

21   process that takes longer but certainly the first step of

22   defense counsel conferring, speaking to the expert, we can do

23   within days, a week at the latest.

24           THE COURT:  Recognizing that the latter part of this

25   week may -- may -- be a holiday for some could I have a letter

K6u5balC                              teleconference

1   from someone on the 14th of July?

2            MS. WILLIS:  Yes, your Honor.

3            THE COURT:  Okay.  That is fine.

4            And you will get from me or from my staff additional

5   information from Ms. Thomas after she has had a chance to look

6   into the issue that was just raised.

7            Ms. Willis, while you and I are speaking with each

8   other, is there anything else you wish to bring to my attention

9   in this call?

10           MS. WILLIS:  No, your Honor.  Thank you.

11           THE COURT:  Of course.

12           And Ms. Mirón, have I addressed the issues that you

13   have raised?

14           MS. MIRÓN:  Yes, your Honor.  Thank you.

15           THE COURT:  Of course.

16           Mr. McKay, is there anything else from the

17   government's perspective, if you are able to speak on its

18   behalf, that you want to address in this call?

19           MR. McKAY:  No.  I think that's all.  Thank you, your

20   Honor.

21           THE COURT:  Of course.

22           Then I am going to convey what I hope are our shared

23   thanks to Ms. Thomas for giving us so much of her afternoon and

24   for being on top of so many things.  And, to each of you

25   participating in the call I wish you well, I wish your families

K6u5balC                          teleconference

1    well, and your clients well in this pandemic, and I wish you

2    continued safety and good health.

3             With that, unless anyone else has anything else to

4    raise, we are adjourned.

5                                    o0o

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25