UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
                                                      :

UNITED STATES OF AMERICA,        :
                                                      :

            v.                         :           **DECISION & ORDER**
                                                      :           20-CR-295 (WFK)

STEVEN CARTER,                    :
                                                      :

                  Defendant.        :
------------------------------------------------------x

**WILLIAM F. KUNTZ, II, United States District Judge:**

Defendant Steven Carter ("Defendant") is charged in a single-count indictment with being a felon in possession of a firearm. Before the Court is Defendant's motion to suppress a firearm found by police officers during a warrantless search of a paper bag on April 29, 2020, and his subsequent post-arrest statements. *See* ECF No. 29 ("Def. Mot."). For the reasons that follow, the Court DENIES the motion to suppress in its entirety.

## BACKGROUND

On August 6, 2020, a grand jury returned a single-count Indictment against Steven Carter ("Defendant") charging him with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), and 924(a)(2). Indictment, ECF No. 1. As alleged in the Indictment, on or about April 29, 2020, Defendant knowingly and intentionally possessed a Smith & Wesson .40 caliber pistol and ammunition, having previously been convicted of one or more crimes punishable by a term of imprisonment exceeding one year. *Id*. ¶ 1. On September 5, 2021, Defendant filed a motion to suppress evidence and post-arrest statements, pursuant to Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure. *See* Def. Mot.; Attorney Declaration, ECF No. 29 ("Padden Decl."). The Government filed its opposition to the motion on October 11, 2021, *see* ECF No. 32 ("Gov't Opp."), and Defendant subsequently filed his reply on October 18, 2021, *see* ECF No. 33 ("Def. Reply").

On February 23, 2022, the Court held a suppression hearing during which it received evidence including testimony from New York City Police Department ("NYPD") Officers Kevin

1

Morgan and Renaldo Weekes, and Detective Debra Lawson.  *See generally* Feb. 23, 2022 Hr'g

Transcript ("Tr.").  The Court received the following exhibits: (1) the firearm, ammunition, and

magazine, GX-1; (2) a brown paper bag and two pieces of cloth, GX-2A, GX-2B, and GX-2C;

(3) body-worn camera footage for Officer Kevin Morgan, dated April 29, 2020, GX-3; (4) body-

worn camera footage for Officer Renaldo Weekes, dated April 29, 2020, GX-5; (5) photographs

of the brown paper bag and contents as they were found on April 29, 2020, GX-6A, GX-6C, and

GX-6E; (6) a photograph of the firearm, ammunition, and magazine, GX-7J; and (7) an aerial

photograph of the area where Milford Street intersects New Lots Avenue and Dumont Avenue in

Brooklyn, New York, GX-8.

## FINDINGS OF FACT

On a motion to suppress, the defendant bears the initial burden to establish that he was

subjected to a warrantless search or seizure.  *United States v. Herron*, 18 F. Supp. 3d 214, 221

(E.D.N.Y. 2014) (Garaufis, J.) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir.

1980)).  The burden then shifts to the Government "to demonstrate by a preponderance of the

evidence[] that the search or seizure did not violate the Fourth Amendment."  *Id*. (citations

omitted).  The testimony and evidence admitted at the suppression hearing established the

following facts by a preponderance of the evidence.[1]

### I.        The Officers and the Area

Officer Kevin Morgan has worked as an NYPD Officer for eleven years and is presently

assigned to the 75th Precinct Detective Squad.  Tr. at 9–10.  He has spent the entirety of his

career with the 75th Precinct, which is responsible for East New York and includes the area

around the intersection of Dumont Avenue and Milford Street.  *Id*. at 10.  Officer Morgan has

---

[1] Where the Court has cited testimony, it has credited that testimony, following consideration of the witness's demeanor, competence, experience, and consistency with other testimony and physical evidence.

patrolled and responded to calls in this area for several years. *Id*. In April of 2020, he was assigned to the 75th Precinct Anti-Crime Team. *Id*. at 9.

Officer Renaldo Weekes has worked as an NYPD Officer for six and one-half years and is presently a Field Intelligence Officer in the 75th Precinct. *Id*. at 75. In April of 2020, he was also assigned to the 75th Precinct Anti-Crime Team. *Id*.

Officers Morgan and Weekes testified the area around the intersection of Dumont Avenue and Milford Street has a "high propensity for crime," including gang activity, drug activity, robbery, and homicide. *Id*. at 10, 77. Officer Weekes testified the 75th Precinct is one of the higher crime precincts within New York City, and that the anti-crime team would select high-crime areas to patrol within the precinct. *Id*. at 76–77.

## II.   Events of April 29, 2020

On April 29, 2020, Officers Morgan, Weekes, and Phillip Bilmes were on duty patrolling the area around the intersection of Dumont Avenue and Milford Street in Brooklyn, New York, in an unmarked police vehicle driven by Officer Morgan. Tr. at 12–13, 78–79. At approximately 11:30 P.M., the officers were driving south on Milford Street towards New Lots Avenue. *Id*. at 13; *see also* GX-8. While stopped at a stop sign at the corner of Milford Street and New Lots Avenue, Officer Morgan observed an individual later identified as the Defendant standing at the southeast corner of the intersection of Dumont Avenue and Milford Street, where Milford Street ends and Charlie Santiago Drive begins. Tr. at 28, 50; *see also* GX-8. Officer Morgan observed the Defendant holding a brown paper bag and pacing back and forth at the intersection, which was illuminated by a nearby streetlight and the lights from a neighboring school. Tr. at 13, 25, 28. Officer Morgan believed the paper bag to contain a heavy object, because one corner of the bag "pulled down further than the other side of the bag." *Id*. at 26.

3

The paper bag appeared worn, wrinkled, and more malleable than a new paper bag. *Id.* at 35; *see also* GX-6A, GX-6C, GX-6E. Officer Morgan testified based on his observations and experiences in the Anti-Crime Team that brown paper bags are consistently used to carry firearms; specifically, he estimated that a paper bag was used to carry a firearm in ten of the approximately fifty gun arrests he had conducted. *Id.* at 29, 35.

As the officers approached the stop sign at the north side of the intersection of Milford Street and Dumont Avenue, Officer Morgan asked the two other officers to "keep an eye on the brown paper bag," because he thought the bag possibly contained a firearm. *Id.* at 29. Officer Morgan recalled no traffic on the block nor any other person standing in the area. *Id.* at 51. Officer Morgan testified that when he stopped at the stop sign, he made eye contact with the Defendant. *Id.* at 29. The Defendant appeared nervous and anxious. *Id.* As the officers drove southbound through the intersection and approached the Defendant, Officer Morgan observed— from a distance of approximately ten to twelve feet—the Defendant turn his body and move the paper bag, held by its handles in his left hand, behind the left side of his body. *Id.* at 31–32. As the Defendant moved, Officer Morgan observed Defendant tightening his hold across the top of the bag, enabling Officer Morgan to see three points of contact between the bag and the L-shaped object it contained. *Id.* at 32–33. Based on his observations and prior experiences with arrests involving guns, Officer Morgan believed there to be a gun in the paper bag at the moment Defendant tightened his hold on the bag. *Id.* at 33. At the hearing, Officer Morgan physically recreated the Defendant's motion, using the paper bag, two pieces of cloth, and firearm repackaged as they were on April 29, 2020.[2] *Id.* at 31–33.

---

[2] At the time of the suppression hearing, the firearm was not loaded and attached to it was a lock which rendered it inoperable. Tr. at 17, 19. Officer Morgan noted the gun at the time of the hearing was significantly lighter than it had been when it was loaded with twelve bullets. *Id.* at 19, 34.

Officer Morgan then stopped the vehicle next to the Defendant, and Officer Weekes exited the vehicle from the rear driver's side. *Id*. at 35. Officer Morgan also exited the car, and saw the Defendant move the bag further behind his body, fully obscuring it from the view of the officers. *Id*. He noticed Defendant appeared anxious and was sweating, despite the cool weather. *Id*. at 37; *see also* Gov't Opp. at 4–5. The Defendant did not attempt to flee or otherwise to resist the officers throughout the encounter. Tr. at 69–70. Officer Weekes and Officer Morgan approached the Defendant and Officer Morgan said, "two minutes out of your life, you'll go on your way," as he placed his hand on the Defendant's left arm. *Id*. at 37; GX-3 at 00:34–00:36. One of the two officers asked Defendant what was in the bag, to which Defendant replied, "nothing but my belongings." Tr. at 40; GX-3 at 00:36–00:40; GX-5 at 00:35-00:39. Officer Morgan then conducted a pat down the outside of the paper bag, at which time he felt the shape of a gun, specifically noting that he was able to feel through the paper bag the grip handle, slide, and front and rear sights of a gun, as well as the trigger guard between the grip and the rest of the gun. *Id*. at 41–42. After feeling the shape of the gun through the paper bag, Officer Morgan removed the bag from Defendant's wrist and searched the bag, finding in it a firearm loaded with twelve bullets. *Id*. at 19, 41, 58; *see also* GX-6A, GX-6C, GX-7J.

Defendant was then handcuffed and placed under arrest. Tr. at 42; GX-3 at 01:02–08. Officer Morgan asked pedigree questions of the Defendant to determine whether he had been arrested before, and whether he was on parole or probation. *Id*. at 43; GX-3 at 01:50–02:10. After placing the paper bag in the car, Officer Morgan asked for Defendant's identification and where he lived. GX-3 at 02:54–59. Officer Morgan testified he had been involved in approximately 280 arrests and had asked arrestees for their name and address in every instance, in order to process the arrest. *Id*. at 44. Officer Morgan also testified the reason he asked

5

Defendant whether he had been arrested before and whether he was on probation or parole because parole and probation officers must be notified of a parolee or probationer's arrest. *Id*. at 72.

In response to the question of his address, Defendant responded that his family was staying nearby and "I don't like this, you know what I mean, this . . . neighborhood, asked my cousin if I could borrow his piece while I came over here to meet her." *Id.* at 03:00–14; *see also* Tr. at 43. Officer Morgan understood "piece" to be a reference to the gun the officers recovered from the paper bag. Tr. at 43. In a pause in Defendant's statement, Officer Morgan made a sound of verbal agreement—"mm-hm"—just prior to Defendant's comment with respect to the "piece." *Id*. at 43, 67. Officer Morgan then said, "you're just going to take a ride back to the precinct and we'll talk to you a little bit back there." GX-3 at 03:18–22. Defendant was not read his *Miranda* warnings during the course of this interaction. *Id*. at 67–69.

Officer Morgan also testified that police officers call out the number "92" in order to signal other officers to place a person under arrest. *Id*. at 59. Neither he nor Officer Weekes could recall whether Officer Morgan called out "92" during the course of events discussed here. *Id*. at 59, 89–95.

### III.   The "Triggerlock Intake" Meeting

Detective Debra Lawson provided testimony regarding a "Triggerlock Intake" meeting which took place subsequent to Defendant's arrest and at which she took handwritten notes. *Id*. at 101-02. Detective Lawson testified she wrote in her notes that Officer Morgan said "92" after exiting the vehicle and approaching Defendant. *Id*. at 102. She also attested to writing in her notes that Officer Weekes had reported during the meeting that Officer Morgan "is the one who saw the L-shape after the fact." *Id*. Detective Lawson testified she does not write down

6

everything said by the interviewee during the meeting. *Id.* at 104–05. Her notes are not reviewed with the officer afterwards to ensure accuracy, and her notes are not a verbatim transcript of the meeting. *Id.* During Officer Weekes's testimony, he stated he was not consulted about the notes taken by Detective Lawson during the meeting, he never reviewed those notes, and seeing those notes at the hearing did not refresh his recollection. *Id.* at 98. Officer Weekes did not recall whether "92" was said during the events of April 29, 2020 nor whether he reported someone had said "92" during the Triggerlock Intake meeting. *Id.*

## DISCUSSION

Defendant argues (1) the physical evidence recovered during his warrantless stop and arrest was obtained in violation of his Fourth Amendment rights and must be suppressed; and (2) the statements Defendant made subsequent to his arrest were taken in violation of his Fifth Amendment rights as well as in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny, and therefore must be suppressed. Padden Decl. at 1. The Court addresses each argument in turn.

### I.      The Stop and Frisk

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). "The *Terry* investigative stop and frisk is one such exception." *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (citing *Terry v. Ohio,* 392 U.S. 1 (1968)). A *Terry* stop is a "brief investigatory stop[] of persons or

vehicles that fall[s] short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002). "Because the balance between the public interest and the individual's right to personal security tilts in favor of a standard less stringent than probable cause in [such cases], the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion that criminal activity may be afoot." *Id*. (quotations omitted).

Courts must consider the totality of circumstances in evaluating the purported basis of reasonable suspicion. *United States v. Cortez,* 449 U.S. 411, 417 (1981). Reasonable suspicion "demands specific and articulable facts which, taken together with rational inferences from those facts, provide detaining officers with a particularized and objective basis for suspecting legal wrongdoing." *United States v. Singletary*, 798 F.3d 55, 59 (2d Cir. 2015) (quotations omitted); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (requiring a "level of suspicion [that] is considerably less than proof of wrongdoing by a preponderance of the evidence"). Multiple factors may form the basis of reasonable suspicion, "including, among other things, the suspect's behavior, the context of the stop, and the crime rate in the area. The Supreme Court has 'consistently recognized that reasonable suspicion need not rule out the possibility of innocent conduct.'" *Weaver*, 9 F.4th at 139 (2d Cir. 2021) (quoting *Navarette v. California*, 572 U.S. 393, 403 (2014)); *see also United States v. Padilla*, 548 F.3d 179, 188 (2d Cir. 2008) ("The high-crime nature of the neighborhood was properly among the relevant contextual considerations in [the officer's] assessment of the situation.") (quotations omitted); *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.")).

A *Terry* frisk requires the same degree of "specific and articulable facts" forming the basis of reasonable suspicion, applied to the specific question whether an officer has "reasonable

8

suspicion not only that criminal activity is afoot, but also that the person suspected is 'armed and dangerous.'" *Weaver*, 9 F.4th at 139 (2d Cir. 2021) (citations omitted). This additional inquiry is conducted in recognition that a frisk is "a more intrusive invasion of a person's security than a stop." *Id*. An officer's perception of an "L-shaped" object has been considered a sufficient basis for reasonable suspicion to conduct a protective frisk. *See United States v. Blake,* No. 16-CR-194, 2017 WL 626603, at *4 (E.D.N.Y. Feb. 15, 2017) (Brodie, C.J.); *see also United States v. Hagood*, No. 20-CR-656, 2021 WL 2982026, at *16 (S.D.N.Y. July 15, 2021) (Engelmayer, J.) (collecting cases).

Furthermore, "law enforcement 'may lawfully seize evidence they touch and can plainly feel is contraband or contains contraband.'" *United States v. Rivera*, 89 F. Supp. 3d 376, 392 (E.D.N.Y. 2015) (Matsumoto, J.) (citing *United States v. Colon*, No. 10-CR-498, 2011 WL 569874, at *13 (S.D.N.Y. Feb. 8, 2011); *Minnesota v. Dickerson*, 508 U.S. 366 (1993)). However, "law enforcement is prohibited from 'physical manipulation' such as 'feel[ing] the bag in an exploratory manner.'" *Rivera*, 89 F. Supp. 3d at 392 (quoting *Bond v. United States*, 529 U.S. 334, 338–39 (2000)).

### A.  When Defendant Was Seized

Before this Court can determine whether Officers Morgan and Weekes had reasonable suspicion to stop Defendant, it "must first determine the precise moment that the *Terry* stop was executed by the officers, namely, when defendant was 'seized,' because only 'the facts available to the officer at the moment of the seizure may be evaluated in determining whether reasonable suspicion warranted the detention.'" *United States v. Mitchell,* No. 08-CR-775, 2009 WL 1472834, at *6 (E.D.N.Y. May 27, 2009) (Matsumoto, J.) (quoting *Terry,* 392 U.S. at 21–22). A seizure occurs when "the officer, by means of physical force or show of authority, has in some

way restrained the liberty of a citizen." *Florida v. Bostick,* 501 U.S. 429, 434 (1991) (quoting *Terry,* 392 U.S. at 19 n.16); *see also United States v. Mendenhall,* 446 U.S. 544, 554 (1980) ("We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave.").

Defendant argues the body-worn camera footage of the officers does not support the claim he was merely being asked questions, or the claim of a pat down consistent with a *Terry* feel. Def. Reply Mem. at 3.

The record demonstrates Officers Morgan and Weekes exited the patrol vehicle, after which point Officer Morgan said, "two minutes out of your life, you'll go on your way," and placed his hand on Defendant's left arm. Tr. at 37; GX-3 at 00:34–00:36. A reasonable person would not believe themselves free to leave after a police officer places a hand on them. *See California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."). Accordingly, the Court holds Defendant was seized at the moment Officer Morgan placed his hand on Defendant's left arm.

## B. Reasonable Suspicion at the Time Defendant Was Seized

To justify their seizure, the officers must have reasonable suspicion of Defendant's illegal activity from the moment Officer Morgan placed a hand on Defendant's arm. The Government argues Officer Morgan's observation of the outline of a heavy L-shaped object in Defendant's paper bag, the high crime rate in the area, Defendant's nervousness and sweating, and Defendant's movement to conceal the bag behind his body formed a sufficient basis for reasonable suspicion to stop Defendant. The Court agrees.

10

When Officer Morgan initially observed Defendant pacing at the intersection of Dumont Avenue and Milford Street, he believed the wrinkled paper bag held by the handles in Defendant's left hand contained a heavy object. Tr. at 13, 25–26, 28, 50. As the officers drew closer, Defendant appeared nervous and turned his body, moving the paper bag behind his left side. Defendant also tightened his hold across the top of the bag, at which point Officer Morgan perceived the bag contained an L-shaped object due to the three points of contact the object made with the bag. *Id*. at 29–33. Officer Morgan noted the following observations as the bases of his suspicion that the bag contained a firearm: (1) the shape of the object visible through the bag, which the witness credibly demonstrated during the course of the hearing, *see id*. at 29–33; (2) the high propensity for violent—and specifically, gun-related—crime in the area, *see id*. at 10, 76–77; (3) the frequency with which he understood guns to be carried in paper bags, *see id*. at 29, 35; (4) the apparent nervousness of Defendant, *see id*. at 37; and (5) Defendant's movements which appeared aimed at concealing the paper bag from view, *see id*. at 31–33.

Even where individual factors, in isolation, might not provide adequate basis for reasonable suspicion, an examination of the totality of the circumstances may warrant a brief investigatory stop. *See Weaver*, 9 F.4th at 140 ("[T]he Court must view the totality of the circumstances through the eyes of a reasonable and cautious officer on the scene, whose insights are necessarily guided by the officer's experience and training, as well as commonsense judgments and inferences about human behavior."). Here, the complete set of circumstances is sufficient to meet the required "level of suspicion [that] is considerably less than proof of wrongdoing by a preponderance of the evidence." *Sokolow*, 490 U.S. at 7 (1989). Each of the considerations of the officers has been found proper to articulate the bases for an investigatory stop and search. *See Arvizu*, 534 U.S. at 273 ("[O]fficers [may] draw on their own experience

11

and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."); *Wardlow*, 528 U.S. at 124 ("[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion.")); *Padilla*, 548 F.3d at 188 ("The high-crime nature of the neighborhood was properly among the relevant contextual considerations in [the officer's] assessment of the situation.") (quotations omitted); *United States v. Williams*, 526 F. App'x 29, 32 (2d Cir. 2013) (finding an observation of the defendant "swaying back and forth, in the middle of the street, at night, in a high-crime area" sufficient to support reasonable suspicion); *United States v. Blake,* No. 16-CR-194, 2017 WL 626603, at *4 (E.D.N.Y. Feb. 15, 2017) (Brodie, C.J.) (holding that officers had reasonable suspicion to stop and search a defendant in a high-crime area with other individuals at night, where an officer observed an L-shaped object in the groin area of the defendant's sweatpants); *United States v. Hagood*, No. 20-CR-656, 2021 WL 2982026, at *16 (S.D.N.Y. July 15, 2021) (Engelmayer, J.) (affirming reasonable suspicion to stop and frisk a defendant and his bag on the basis of, *inter alia*, officers' observations of a fanny pack containing an object with a rigid outline consistent with the shape of a gun, the high crime nature of the area, and the nervousness of the defendant).  Considering the totality of the circumstances, the officers had formed the requisite reasonable suspicion to stop and frisk the Defendant and to frisk the bag, which they reasonably believed contained a firearm.

Once Officer Morgan frisked the outside of the paper bag and felt the distinctive shape of a firearm in the bag, he was authorized to seize the bag and search its contents under the "plain feel" doctrine.  *See Minnesota v. Dickerson*, 508 U.S. at 376 ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already

authorized by the officer's search for weapons."); *see also United States v. Ocampo*, 650 F.2d 421, 429 (2d Cir. 1981) ("Where the contents of a container are easily discernible by frisking the exterior of a package, . . . it would be a pointless formality to require that the agents first obtain a warrant before examining the contents.").

Accordingly, the investigatory stop and search by Officers Morgan and Weekes of Defendant and his paper bag was lawful, and physical evidence recovered during this search need not be suppressed.

## II.      Defendant's Statements Subsequent to Arrest

The Fifth Amendment requires law enforcement to advise an individual of certain rights prior to being subjected to a "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). A custodial interrogation occurs when authorities (1) interrogate a suspect and (2) conduct their interrogation while the suspect is "in custody." *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011). An individual is "in custody" if, considering the totality of the circumstances, "a reasonable person in the suspect's position would have understood herself to be subjected to restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d at 153 (quotations omitted). This inquiry includes:

> the interrogation's duration; its location (e.g., at the suspect's home, in public, in a police station, or at the border); whether the suspect volunteered for the interview; whether the officers used restraints; whether weapons were present and especially whether they were drawn; [and] whether officers told the suspect he was free to leave or under suspicion.

*Id.* at 153.

An "interrogation" includes express questioning of the suspect and its "functional equivalent[:] . . . words or actions on the part of law enforcement officers that the officers should know are reasonably likely to elicit an incriminating response for the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Spontaneous statements not elicited by an officer's

interrogation are not subject to *Miranda* protection. *See United States v. Legree*, 375 F. Supp. 3d 222, 231 (E.D.N.Y. 2019) (Irizzary, J.); *Patterson v. New York*, No. 08-CV-5009, 2010 WL 1438216, at *6 (E.D.N.Y. Apr. 9, 2010) (Ross, J.); *see also Jackson v. Conway*, 763 F.3d 115, 137 (2d Cir. 2014) ("Absent an interrogation, there can be no infringement of the Fifth Amendment rights *Miranda* was designed to protect.").

Furthermore, under the "routine booking question" exception, the "collection of biographical or pedigree information through a law enforcement officer's questions during the noninvestigative booking process that typically follows a suspect's arrest . . . does not ordinarily implicate the prophylactic protections of *Miranda*." *Rosa v. McCray*, 396 F.3d 210, 221 (2d Cir. 2005) (citing *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990)). In *Pennsylvania v. Muniz*, questions "requested for record-keeping purposes only," which "appear[ed] reasonably related to the police's administrative concerns" were held outside the protections of *Miranda* and therefore not subject to suppression. 496 U.S. at 601–02.

Defendant argues the statements he made after his arrest were taken in violation of the Fifth Amendment and *Miranda* and should be suppressed on that basis. Padden Decl. at 1, 5. The Government asserts Defendant's admission that he borrowed his cousin's firearm was not made in response to "custodial interrogation" by the officers and therefore does not implicate the Defendant's Fifth Amendment right against self-incrimination. Gov't Mem. at 16.

The record reflects Defendant was arrested when he was handcuffed. Tr. at 42; GX-3 at 01:02–08. Approximately two minutes later, Officer Morgan further stated, "you're just going to take a ride back to the precinct and we'll talk to you a little bit back there." GX-3 at 03:18–22. Defendant was handcuffed and informed he would be taken to the precinct, both of which constituted "restraints comparable to those associated with a formal arrest." *FNU LNU*, 653 F.3d

14

at 153.[3]  The officers plainly had probable cause to believe Defendant had committed a crime and to arrest Defendant following their discovery of the firearm in Defendant's paper bag and prior to placing him in handcuffs.  *See Terry*, 392 U.S. at 10 ("If the 'stop' and the 'frisk' give rise to probable cause to believe that the suspect has committed a crime, then the police should be empowered to make a formal 'arrest.'").  The primary issue at bar is whether Defendant's statements with respect to the firearm were then taken in violation of his Fifth Amendment right against self-incrimination.  The Court finds they were not.

Officer Morgan attested his practice of asking arrestees for their name, date of birth, address, past arrests, and whether they are on parole or probation is a routine part of the procedure to process an arrest.  Tr. at 43–44, 72; GX-3 at 01:50–02:10; 02:54–59.  These types of questions have previously been held "reasonably related" to the "administrative concerns" of the police.  *See Pennsylvania v. Muniz*, 496 U.S. at 601 (concluding questions as to, *inter alia*, defendant's name, address, and date of birth fell within the "routine booking exception" to *Miranda* protection); *United States v. Nogueira*, No. 08-CR-876, 2009 WL 3242087, at *2 (E.D.N.Y. Oct. 6, 2009) (Gleeson, J.) ("[C]ertain questions [] are so central to the booking and bail process that their permissibility cannot be in doubt. . . . [Q]uestions asked at the time of booking regarding an arrestee's name, aliases, date of birth, address, place of employment and marital status fall within the purview of this exception.").  Furthermore, neither the questions nor Officer Morgan's sound of verbal agreement, Tr. at 43–44, were "likely to have a force of a question on the accused" and thereby reasonably considered "likely to elicit an incriminating

---

[3] The hearing elicited indeterminate testimony about whether "92" was said by one of the officers as they approached Defendant.  Tr. at 59, 89–95, 98, 102.  However, whether or not "92" was said is irrelevant.  *See United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004) ("[Defendant's] claim that he was arrested when he first came in contact with the police is based largely on the misplaced argument that the officers intended to arrest him at the outset. However, the officers' subjective intent does not calculate into the analysis of when [the defendant] was arrested.").

response." *Pennsylvania v. Muniz*, 496 U.S. at 601 (quotations omitted).  Accordingly, the Court finds Defendant's statements were not made subject to a "custodial interrogation" and need not be suppressed.

## CONCLUSION

For the foregoing reasons, the Court holds the physical evidence and Defendant's post-arrest statements were not seized or taken in violation of Defendant's rights.  The Court DENIES Defendant's motion to suppress in its entirety.  ECF No. 29.  The Clerk of Court is also respectfully directed to terminate the motion pending at ECF No. 39.  *See* Tr. at 7.

**SO ORDERED.**

**s/ WFK**
_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: March 8, 2022
       Brooklyn, New York

16